STATE OF MISSOURI, on the Information of JOHN M. DALTON, Attorney General, Relator, v. THE METROPOLITAN ST. LOUIS SEWER DISTRICT, a Body Corporate, Municipal Corporation, and Political Subdivision of the State of Missouri; WILLIAM C. E. BECKER, JOHN M. BOGDANOR, JOSEPH L. DORAN, WILLIAM W. MARTIN, J. E. WILLIAMS, JR., and GEORGE C. WILLSON, Trustees of The Metropolitan St. Louis Sewer District, Respondents, No. 44550 —275 S. W. (2d) 225.

Court en Banc, January 10, 1955.

Rehearing Denied, February 14, 1955.

———

2

*John M. Dalton,* Attorney General, and *Robert R. Welborn,* Assistant Attorney General, for relator.

4

*John P. McCammon* for respondents.

[228] HYDE, J.—Quo warranto against the Metropolitan St. Louis Sewer District and its trustees on the ground that it is operating under an invalid and unconstitutional plan. There is no dispute about the facts. The issue to be decided is whether the Plan under which the District is organized and operating attempts to confer

6

powers in excess of the constitutional authority under which the District was formed.

■ Sec. 30(a), Art. VI (all constitutional references are to the Constitution of 1945) authorizes the people of St. Louis City and St. Louis County "to establish a metropolitan district or districts for the functional administration of services common to the area included therein"; and provides that this power "shall be exercised by the vote of the people of the city and county upon a plan prepared by a board of freeholders." The freeholders were properly selected to prepare a plan for a Metropolitan Sewer District and the plan prepared by them has been adopted by the voters. Relator contends the entire plan should be held unconstitutional and void as in excess of any constitutional authorization.

Sec. 30(b) provides that, upon adoption by the voters the plan "shall become the organic law of the territory therein defined, and shall take the place of and supersede all laws, charter provisions and ordinances inconsistent therewith relating to said territory." The authority to prepare such a district plan is a broad grant of legislative power to the freeholders (with confirmation by the voters) similar to the grants in Sections 18, 19 and 20, Article VI, giving certain counties and cities the right to frame, adopt and amend their own charter. It is even greater because their plan supersedes conflicting laws. It is a recognition of the fact that the St. Louis Metropolitan area has many problems which require "services common to the area"; and it warrants provisions for powers, essential to preservation of the public health and welfare, for a district such as this one which, as hereinafter shown, exercises only governmental powers. The apparent intent is to give the freeholders, with the approval of the voters, power to do whatever the Legislature could ordinarily do with respect to the creation, organization and authority of such a district.

The District Plan adopted in this case provides for its incorporation and government (Art. 1), its boundaries and extensions (Art. 2), its powers (Art. 3), enforcement of its ordinances (Art. 4), its board of trustees (Art. 5), its executive director (Art. 6), its finances (Art. 7), its personnel (Art. 8), its improvements (Art. 9), its elections (Art. 10) and amendments (Art. 11). There are miscellaneous provisions in Article 12 and there is a schedule fixing the date of the election on its adoption, the effective date of the Plan, and the appointment, first meeting and first expenses of the trustees. Relator summarizes the powers [229] of the District as set out in the Plan, as follows:

"(1) To extend the existing sewer system;

"(2) To prevent pollution of water (Sec. 3.020(1));

"(3) To prepare and adopt plans, designs, estimates, etc., for sewer system, pumping and ventilating stations, disposal and treating plants, etc., as the Board may deem necessary (Sec. 3.020(2));

"(4) To construct extensions and additions on public or private property (Sec. 3.020(3));

"(5) To construct sewage disposal plants and to sell products or by-products manufactured in. the course of sewage treatment (Sec. 3.020(4));

"(6) To acquire and to sell personal property (Sec. 3.020(5));

"(7) To exercise the power of eminent domain (Sec. 3.020(6));

"(8) To contract for. the construction of sewers and their use with either private persons or public agencies (Sec. 3.020-(7));

"(9) And to charge therefor (Sec. 3.020(8));

"(10) To contract for and to operate facilities for the abatement of water pollution by industrial waste (Sec. 3.020(9));

"(11) To seek and obtain grants in aid (Sec. 3.020(10));

"(12) To make social security agreements for the benefit of employees (Sec. 3.020(11));

"(13) To incur debts by borrowing or otherwise and issue appropriate evidence thereof (Sec. 3.020(13));

"(14) To issue tax anticipation warrants (Sec. 3.020(14));

"(15) To issue bonds payable (1) from taxes, (2) from special benefit assesments, (3) from revenues, or (4) ·from any combinations of such methods (Sec. 3.020(15));

"(16) To establish rates and charges for use of sewer facilities (Sec. 3.020(16));

"(17) To contract with municipalities or water companies for the collection of sewer service charges (Sec. 3.020(17));

"(18) To enter upon any lands for the purpose of making surveys (Sec. 3.020(18));

"(19) To approve plans and designs for sewers, pumping, disposal and treatment plants, and no such facilities shall be constructed without the approval of the District (Sec. 3.020(19));

"(20) To levy, assess and collect taxes on all taxable property in the District (Sec. 3.020(20));

"(21) To fix, levy and collect special benefit assessments on real property in the District (Sec. 3.020(21));

"(22) To provide a retirement system for employees (Sec. 3.020 (22));

"(23) To require owners of real property to connect with sewer facilities of the District (Sec. 3.020(23));

8

"(24) To subdivide the District into subdistricts and provide the boundaries therefor (Sec. 3.020(24));

"(25) To make contracts and execute all instruments necessary in the premises (Sec. 3.020(12));

"(26) And to provide for the functional administration of other services when authorized by amendment of the Plan (Sec. 3.020(25));

"(27) To establish flood control lines and to control the use of private lands within said lines, to alter channels and regulate the erection of all structures within such flood lines (Sec. 3.030);

"(28) To police streams and prohibit dumping therein (Sec.3.040); and

[230] "(29) To impose penalties for violations of its ordinances (Sec. 3.010)."

Relator says the Constitution only authorizes the establishment of a metropolitan district, "for the functional administration of services common to the area included therein", and contends the above enumerated powers attempted to be granted in the Plan are far in excess of requirements for that purpose. Relator argues for a narrow definition of the term "functional administration" and says that a valid plan could only confer powers which were directly related to the operation of sewer facilities in the area included in the Plan. Powers which relator specifically claims are beyond the authority to operate sewer facilities are those stated in Sec. 3.030 to establish building lines or floodway reservation lines along or adjacent to any watercourse or stream and to prevent building without permission within such lines, which relator says confers zoning powers; and those stated in Sec. 3.040 to police and clean out channels of streams, to prohibit dumping therein and to require removal of material deposited within the lines fixed by the District. Relator further claims the District includes areas which do not have common sewer problems because they drain through different watersheds. Relator also says "the following may not properly be considered within the scope of the constitutional limitation of 'functional administration': (1) The condemnation of property authorized by Section 3.020(6) of the plan; (2) Unlimited borrowing authorized by Section 3.020(13); (3) The bonding of the District, authorized by Section 3.020(15); (4) The issuance of tax anticipation warrants, authorized by Section 3.020(14); and (5) The taking over by the District, without compensation, of all sewers in the area covered, under Section 3.010."

However, the constitutional authority is not merely to prepare and adopt a plan for operation of sewer facilities. It does not say services common to sewers. Instead it authorized a plan for operation of "services common to the area." This is a very broad term and is

not limited to any particular kind of services. Moreover, the authority is for a plan which "shall become the organic law of the territory" on the subjects and purposes of the plan. Our view is that all services, common to the area for the protection of the public health and welfare in connection with drainage and sewage disposal, may be properly established for such a district as this. We think the term "functional administration" of such services, as used in the Constitution, means the administration of such services so as to make them function properly for the purposes for which they were intended, namely: preservation and protection of the public health and welfare by drainage and sewage disposal. Drains and sewers are closely connected, with many related problems, and have a common purpose with respect to public health and welfare; so that similar principles are applicable to both. (17 Am. Jur. 780, Sec. 2; See also 28 C. J. S. 231, Sec. 1.) It is certainly proper for a single district to handle the problems of both. (See Chap. 248, especially Sec. 248.010 authorizing districts for construction of drains or sewers. Statutory references are to RSMo. and V.A.M.S.) Providing for drainage and sewerage is a governmental function and an exercise of the police power of the state. (State ex rel. Becker v. Wellston Sewer District, 332 Mo. 547, 58 S.W. (2d) 988; Louisville and Jefferson County Metropolitan Sewer District v. Town of Strathmoor Village, (Ky.), 211 S. W. (2d) 127; 17 Am. Jur. 780-781; Sec's. 3-5, 785-786, Sec's. 11-13; 28 C.J.S. 232, Sec. 2.) Therefore, it was proper to provide in the Plan for powers to prevent pollution of water, to plan and construct sewers and sewer plants and to require their use, to regulate drainage by establishing building lines and floodway reservations along watercourses, to prevent building within such lines, to police and clean out channels of streams and to prevent dumping therein. It is very likely that proper sewage disposal could not be accomplished without proper drainage control, especially in the situation herein involved. It is shown by relator's exhibit (filed with and made a part of its petition) "that most industrial, [231] commercial, and residential property in the County is on comparatively high ground and drains downhill through the City." It is easy to understand what floods caused by inadequate drainage can do to sewage disposal. We hold the powers authorized by the Plan for drainage, sewage disposal and prevention of pollution and obstruction of streams are within the constitutional authority and valid.

Relator's claim that the Plan attempts to include in the District areas, which have no common problems of sewage disposal, is based on the inclusion of three county areas that do not drain through the City. These are the Lemay Sewer District, which has a sewer system draining directly into the Mississippi River below the southern limits of the City; the Gravois Creek watershed which drains into the

River Des Peres a short distance above the place where that river flows into the Mississippi and which relator says drains only a very small part of the City, and the Coldwater Creek watershed which drains a part of the County north of the City and flows into the Missouri River above its confluence with the Mississippi. However, the area to be included in such a District is a matter of legislative discretion (in this case of the freeholders with the approval of the voters) subject, of course, to the limitation that it must not be arbitrary and unreasonable. (See 11 Am. Jur. 901, Sec. 199; 17 Am. Jur. 791, Sec. 20; 28 C. J. S. 240, Sec. 7.) As stated in relator's exhibit "disease communicating insects and microbes recognize no political boundaries of county, city, or village." Thus, health hazards of raw sewage, septic tank effluent or inadequately treated sewage affect areas other than those of the watershed through which they drain. It is suggested that one large disposal plant for sewage from areas draining into the Mississippi south of the City would be the most effective and economical way to protect the people of the City and those of adjacent areas of the County. As to the area north of the City, draining into the Missouri River, not only are these same factors present but also this sewage must flow down the Mississippi past the City and the waterworks which supply the City. We, therefore, hold that it does not appear unreasonable to include these areas in the District and that the Plan is not invalidated by their inclusion.

 The other powers·objected to, namely, condemnation, 3.020(6), incurring debts, 3.020(13), issuance of tax anticipation warrants, 3.020(14), and issuance of bonds, 3.020(15), are essential powers of such a District. Our Legislature has always given drainage and sewer districts the power of condemnation and they could not function without it. (See Chap. 249, relating to sewer districts in the County; See also 17 Am. Jur. 789, Sec. 18, p. 811, Sec. 54; 28 C.J.S. 233, Sec. 2.) Likewise, without the power to incur debts and issue bonds, adequate drains, sewers and disposal plants could not be constructed. However, in the exercise of this power, the District is subject to the financial limitations imposed by the Constitution on all governmental subdivisions. Therefore, it cannot by tax anticipation warrants or otherwise "become indebted in an amount exceeding in any year the income and revenue provided for such year plus any unencumbered balances from previous years", without "a vote of two-thirds of the qualified electors voting thereon", and even then, "not to exceed five per centum of the value of taxable tangible property" of the District. (Sec. 26, Art. VI.) These limitations are recognized and stated in the Plan, Sec's. 7.130 and 7.150. We hold these contested powers, with the limitations placed on them are proper and valid powers and that the Plan is not invalidated by establishing them.

 The provision of Sec. 3.010 for taking over all existing sewers, constructed by public agencies, is likewise a necessary, proper and

valid provision. These sewers are not private property; they have been built for public purposes under the police power of the state. They are public property and their transfer to this District is a mere transfer of custodianship. (Veail v. Louisville and Jefferson County Metropolitan Sewer District, (Ky.), 197 S. W. (2d) 413.) [232] We have stated similar principles as to property of school districts. (See School District of Oakland v. School District of Joplin, 340 Mo. 779, 102 S. W. (2d) 909.) The transfer is only from one public trustee to another.

Relator also makes the following contentions about the taxing powers of the District and the methods provided for assessing and collecting taxes: (1) that the provision for taxing all tangible property is in excess of its authority and invalid; (2) that the attempt to levy property taxes at different rates in the City and the County violates Sec. 3, Art. X of the Constitution; (3) and that the method provided for assessing and collecting taxes which imposes duties on City and County officers is improper and invalid. As to the first contention, relator points out that Sec. 30(b), Art. VI, under which this District is organized, provides: ''The plan shall provide for the assessment and taxation of real estate in accordance with the use to which it is being put at the time of the assessment, whether agricultural, industrial or other use, giving due regard to the other provisions of this Constitution.'' This does not say that tangible personal property may not be taxed by the District. As hereinafter stated, we do not think this provision relates to taxation for the general purposes of the District, because it provides a different basis of assessment than is provided for general taxes. (See Sec. 4(b), Art. X.) Other provisions of the Constitution do authorize consideration of all tangible property together in connection with the limitations on and requirements for payment of the indebtedness of any political subdivision of the State, which is how this District is classified for purposes of taxation. (Sec. 15, Art. X.) Sec. 26(b), Art. VI, prohibits any such district as this from becoming indebted in excess of ''five per centum of the value of taxable tangible property therein as shown by the last completed assessment for state and county purposes.'' Sec. 26(f), Art. VI, provides that before incurring any indebtedness any such district ''shall provide for the collection of an annual tax on all taxable tangible property therein sufficient to pay the interest and principal of the indebtedness.'' Real and tangible personal property are also placed on the same basis in several provisions of Article X on taxation. (See Sec's. 8, 11(a), and 12(a). ) Relator does not claim the District has no right to tax real estate for its general purposes and our view is that it was within the constitutional grant of legislative power to provide for taxation of all tangible property for the general purposes and general obligations of the District. Ad valorem taxation

of all taxable property in sewer districts has heretofore been authorized. (See Sec. 249.090; see also 28 C.J.S. 232, Sec. 2.) Sec. 11(a); Art. X provides that political subdivisions, which under Sec. 15, Art. X includes drainage, sewer and levee districts, may levy taxes on all property subject to their taxing powers. We hold it was proper for the Plan to provide for general taxation of tangible personal property as well as real estate.

■ Sec. 11(a), Art. X also provides that the assessed valuation in any political subdivision "shall not exceed the assessed valuation of the same property for state and county purposes." Sec. 3, Art. X requires that taxes "shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax." These provisions are for the purpose of bringing about uniformity in assessment and levy of taxes. They apply to general taxes and we do not believe that the framers of the Constitution intended to change the basis of assessment for taxes on property for the general purposes of such a district by what was said in Sec. 30(b), Art. VI. Real property (and tangible personal property) is required by Sec. 4(b), Art. X to be "assessed for tax purposes at its value or such percentage of its value as many be fixed by law." It seems more reasonable to believe this provision for "assessment and taxation of real estate in accordance with the use to which it is being put at the time of the assessment" referred to special assessments. The use to which the property is being put is more applicable to the basis of benefits which is the usual criterion for [233] special benefits. "A special assessment can be levied only on land." (48 Am. Jur. 566, Sec. 3.) A special assessment "is not a tax in the sense of a tax to raise revenue for general governmental purposes" but it "is taxation in the sense that it is a distribution of that which is originally a public burden." (48 Am. Jur. 565, Sec. 3, p. 571, Sec. 9; See also 28 C.J.S. 397, Sec. 55.) Thus these terms must have been used in this latter sense. In any event, the statement was qualified by the final clause, "giving due regard to the other provisions of this Constitution." This very clearly prevents the assessment of property for general purposes of the District from being made on any other basis than its value (Sec. 4(b), Art. X) and requires that such value shall not exceed the assessed valuation for state and county purposes. (Sec. 11(a), Art. X.) Therefore, the District may properly take the assessment of real and tangible personal property, made by the City and County Assessors, as its assessment basis for taxes for its general purposes.

■ The matter of conflict with Sec. 3, Art. X by levying general property taxes at different rates in the City and the County, presents a serious question. We cannot uphold the method of levying general taxes adopted by the Board because it does not conform to constitutional requirements. Sec. 7.180 provides that after determining the

amount of taxes required for the next year (for operation and maintenance and also for any interest or maturing principal on District bonds) the Board of Trustees (the governing body of the District, Sec. 1.020) shall certify to the Board of Aldermen and other specified officers of the City the amount of such taxes to be collected on all taxable tangible property in the District within the corporate limits of the City and shall certify to the County Council and other specified officers of the County the amount of such taxes to be collected on all taxable tangible property in the District within the County. Sec. 7.180 then provides that the officers of the City and County "shall levy such rate of taxation upon all taxable tangible property in the District * * * within their respective jurisdictions as will produce the respective amounts of taxes certified."

The result of this method for the first year is that a tax of three cents per one hundred dollars assessed valuation is required to collect the amount certified to be collected in the County while a tax of only two cents on such valuation is required to collect the amount certified to the City. This result is in direct conflict with Sec. 3, Art. X which provides: "Taxes * * * shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax." This provision clearly prohibits taxing real estate and tangible personal property for the general purposes and general obligations of the entire District at a different rate on its valuation in various parts of the District. This tax is the general tax of the District and the levy is made for the District and not for City and County whose officers act for the District in making it; and it is not uniform on the same class of subjects within the territorial limits of the District which authorizes the levy and receives the taxes. Surely no one would claim that the Missouri General Assembly could avoid this constitutional uniformity provision, in providing a tax for the general purposes of the state, by apportioning the amount to be collected in each County so that the required rate of levy would be different in each County instead of being uniform throughout the state. "If the tax is a state tax it must be uniform throughout the state. If the tax is a county tax, it must be uniform throughout the county, etc. * * * The uniformity corresponds to the territorial limits of the taxing district." (1 Cooley on Taxation 645, Sec. 311.) Clearly fixing the amount to be collected has the effect of fixing the rate and is the vital step in levying the tax. (See 51 Am. Jur. 614, Sec. 647.) The word levy "is sometimes used, in the administrative sense, as referring to the mere ministerial or executive acts of ascertaining and entering taxes on the tax book and collecting them." (84 C.J.S. 679, Sec. 349.) We construe Sec. 7.180 to use the term "levy" substantially in that sense. Therefore, [234] we must hold that the portion of the property tax in the County in excess of that in the City is an invalid levy.

Of course, this uniformity does not apply to special assessments which are on a different basis from ad valorem taxes (see State ex rel. Jones v. Nolte, 350 Mo. 271, 165 S. W. (2d) 632) but this tax is levied for the general purposes and general obligations of the entire District and must be uniform throughout the District to comply with the Constitution. Undoubtedly, if the City and County were each made subdistricts for separate improvements in each, a tax to pay for such separate improvements would present a different situation. Furthermore, authority for apportionment of the amounts to be collected for the general purposes of the entire District between the City and County without any standards whatever would be invalid for another reason. Sec. 3, Art. X is a recognition of the principle of equality and uniformity of taxation required by the equal protection clause of the Fourteenth Amendment of the Federal Constitution which "imposes a limitation upon all powers of the state which can touch the individual or his property, including among them that of taxation." (1 Cooley on Taxation, 4th Ed. 530, Sec. 249; See also 12 Am. Jur. 207, Sec. 518; 51 Am. Jur. 222-225, Sec's. 167-169; 16 C.J.S. 1042, Sec. 520; 84 C.J.S. 75, Sec. 21 et seq.; Kansas City Southern Ry. Co. v. Road Improvement Dist. No. 6, 256 U.S. 658; 41 S. Ct. 604, 65 L. Ed. 1151; Hillsborough Twp. v. Cromwell, 326 U. S. 620, 66 S. Ct. 445, 90 L. Ed. 358; State ex rel. Ashby v. Cairo Bridge & Terminal Co., 340 Mo. 190, 100 S. W. (2d) 441.) While classification may be made in tax legislation, it must be a reasonable classification and there can be no discrimination between taxable subjects which properly belong to the same class. (See 51 Am. Jur. 235-239, Sec's. 176-178; 84 C.J.S. 112, Sec. 36; 1 Cooley on Taxation, 4th Ed. 712, Sec. 334.) Certainly whether property, of the same value and in this same District, is located in the City or the County is not a reasonable basis for classification for taxation for the general purposes and general obligations of the entire District, especially since the part of the County in the District is essentially urban, much of it in incorporated cities. To make this the sole basis for a different amount of tax on the same valuation for the same purpose would be palpably arbitrary and unreasonable. As the above cited authorities show, a levy based on such arbitrary action would be invalid at least to the extent of the unequal result obtained.

However, an attack upon the constitutionality of a statute will not be sustained if there is any reasonable theory upon which its constitutionality may be upheld; and if it is susceptible of two constructions, one making it valid and the other invalid, construction sustaining validity will be adopted. (State ex rel. Kelley v. Kirby, 260 Mo. 120, 168 S. W. 746; State ex rel. Columbia Telephone Co. v. Atkinson, 271 Mo. 28, 195 S. W. 741; Automobile Gasoline Co. v. City of St. Louis, 326 Mo. 435, 32 S. W. (2d) 281; State ex rel. Webster

Groves Sanitary Sewer Dist. v. Smith, 342 Mo. 365, 115 S. W. (2d) 816; Zinn v. City of Steelville, 351 Mo. 413, 173 S. W. (2d) 398.) Sec. 7.180 read alone states no standards for making the apportionment between the City and the County, and seems to authorize arbitrary action. However, when it is read and construed with Sec. 1.020 it can be held valid. Sec. 1.020 provides: "Pursuant to the provisions of this Plan and *subject to the limitations imposed* hereby and *by the Constitution of Missouri*, all powers of the District shall be vested in a Board of Trustees." (Our italics.) This reads Sec. 3, Art. X into and makes it a part of Sec. 7.180 and requires an apportionment that will result in a uniform tax. It is apparent that the Board could make an apportionment on the basis of assessed valuation which would produce a uniform tax on all tangible property in the District and such a tax levy would be valid. The situation presented by this record is an invalid exercise of a valid power. We, therefore, hold that Sec. 7.180 does not invalidate the Plan.

[235] As to the duties imposed on City and County officers in assessment, levy and collection of District taxes, we hold this is not improper. It is very similar to what has previously been done by the Legislature in provisions for drainage and sewer districts. (See Chap's. 248 and 249, particularly Sec's. 248.120 and 249.130.) However, there is no good reason why the District Board should not be authorized to make the complete levy of the general tax rate itself as does the School Board of the City. (See Sec. 165.637.) As we have noted, fixing the amount to be collected determines the tax rate. (See 51 Am. Jur. 621, Sec. 656; 84 C.J.S. 679, Sec. 349.) Of course, it is proper to use the property assessment made by the Assessors of the City and County and that is the advisable thing to do in view of the limitations of Sec. 26(b), Art. VI and Sec. 11(a), Art. X. Collection of taxes by the Collectors of the County and City is not only proper but in accord with the ordinary practice and usual provisions for collection of taxes of political subdivisions with power to tax. We hold that the District is properly organized and established in accordance with the constitutional authority; that the challenged powers are proper and valid; and that the trustees are properly and lawfully occupying their positions as such.

Judgment of ouster is denied. All concur.

ON MOTION FOR REHEARING OR TO MODIFY OPINION

HYDE, J.—Respondents argue for a change in our ruling concerning Sec. 7.180 of the Plan. They say that the basis of assessment in the City and the County is not the same and that it is necessary to make an apportionment between the City and the County of the total amount to be collected by general taxes in order to have uniformity of taxation. They say "when all taxpayers outside of

the City are assessed at a lower percentage of fair value than those within the City, those within the City may properly demand that the tax may be made uniform, in accordance with the guarantees of the state and federal constitutions. * * * Realizing, as the Board of Freeholders did, that with different assessors, different assessment theories and practices, with also a possibility that the resulting valuations in City and County might well lack uniformity, they wisely provided the means whereby the Board of Trustees could secure uniformity of the tax. This result is accomplished by the device of hearings and findings of fact. (Sec. 7.190, Plan.) * * * The Board of Trustees made the determination that an 'equalization' of the tax will require the collection of the amounts set out in the ordinance.''

In the first place, there is nothing in the record in this case about unequal assessments. However, and more important, our Constitution provides the method for having equal assessments by requiring in Sec. 4b, Art. X that real and tangible personal property ''shall be assessed for tax purposes at its value'' (except where percentage of value is authorized by law); and the General Assembly has established the State Tax Commission to enforce this provision. Sec's. 138.380 and 138.390 RSMo., V.A.M.S. give the State Tax Commission ample authority for this purpose. Futhermore, there is no reason why the District could not be authorized to make its own assessments if that seems desirable. Sec. 11(a), Art. X prohibits the District's assessed valuations from exceeding the assessed valuation for state and county purposes but does not say they shall not be lower. What respondents really argue for (under their view of Sec. 7.180 of the Plan) is the power to in effect exceed the valuations for state and county purposes in the County by levying their general taxes on the basis of what they believe the County assessments should be. They would do this by apportioning to the County the amount of taxes which they believe would be produced by assessments in the amounts they think should have been made by the County. We reaffirm our ruling that the Constitution prohibits this method.

The motion is overruled. All concur.