**Robert REUTNER and Lucille Reutner, His Wife, and Claud E. Kahmann, Plaintiffs-Respondents,**

**v.**

**Arnold VOUGA, David Davit, and Jean L. Vouga and Madeline Vouga, His Wife, Defendants-Appellants.**

No. 31235.

St. Louis Court of Appeals.

Missouri.

April 16, 1963.

Motion for Rehearing and for Transfer to Supreme Court Denied May 14, 1963.

Grand, Peper, Martin & Roudebush, Malcolm W. Martin, Lewis R. Mills, William A. Richter, St. Louis, for defendants-appellants.

Gerwitz & Seegers, Gerald L. Seegers, St. Louis, for plaintiffs-respondents.

DOERNER, Commissioner.

This action in equity stems from the construction by defendants of storm sewers to serve their subdivision, situated in the City of Frontenac in St. Louis County

The trial court granted plaintiffs certain equitable relief, as well as monetary damages, and defendants appeal.

The following sketch of the area will facilitate a better understanding of the facts and the issues presented on appeal:

At all material times the defendants, except Arnold Vouga, owned the land denominated on the sketch as Vouga Estates. Their property extended from Conway Road on the south to the Missouri Pacific Railroad right-of-way on the north, and lay west of the unbroken line between those two points shown on the sketch, which will be referred to as the dividing line or the property line. About 1948 plaintiffs Robert and Lucille Reutner, husband and wife, purchased the parcel marked "Reutner tract," which adjoined and was east of the dividing line between the Vouga Estates and the other properties. Prior thereto, at their instigation, the then owners of the real estate lying on either side of the dividing line, by a written instrument filed of record, created for road purposes for their mutual use and benefit, and that of their heirs and assigns, the roadway easement indicated on the sketch by the dotted lines. This roadway easement was 20 feet wide, 10 feet thereof being on either side of the dividing line, and extended northwardly about 1150 feet from the center line of Conway Road.

At the time the Reutners acquired their property they installed a 10 foot rock driveway on the roadway easement, 5 feet thereof being on either side of the dividing line. This rock driveway ran from Conway Road northwardly for about 300 feet, to a turnaround between their house and their garage.

About 1954 plaintiff Kahmann purchased the 17.9 acre tract marked "original Kahmann tract" on the sketch. As shown, the southern part of Kahmann's original land was adjacent to and east of Vouga Estates, but the northern portion, as indicated on the sketch, was separated from it by a 5½ acre tract. The northern 4½ acres of this tract was owned by Edouard Vouga and Katherine Alt Vouga, his wife, and the remaining acre by Josephine M. Alt. On November 29, 1957, plaintiff Kahmann entered into separate contracts with Mr. and Mrs. Edouard Vouga and Josephine M. Alt for the purchase of these 5½ acres, and after one extension of the closing date he ac-

quired the legal title to the properties on January 7, 1958. In the interim, on December 7, 1957, Mr. and Mrs. Vouga granted an easement to the Metropolitan St. Louis Sewer District (hereafter called the Sewer District) across their 4½ acre parcel which gave the Sewer District "the exclusive right to build and maintain a sewer or sewers on the strip or strips of ground" as shown on the foregoing sketch. This easement was 10 feet wide and 170 feet long. Plaintiff Kahmann had actual knowledge of the grant at the time it was made, and, in fact, procured Mrs. Vouga's signature to the written instrument at the request of defendant Arnold Vouga. The latter, while not an owner of the property called Vouga Estates, was the son of defendants Jean L. and Madeline Vouga, and (as stipulated by the parties) acted as the agent for all of the defendants in the development of the subdivision and as such committed the acts which gave rise to this litigation.

The plans for the storm sewer system for Vouga Estates were prepared for the defendants by an engineering firm employed by them. Broadly speaking, the system as planned and constructed consisted of two parts, each independent of the other, one of which drains the surface water from the northern portion of the subdivision and the other from the southern part. In both parts, generally speaking, the flow of the water is from the west to the east. In accordance with the plans, defendants' sewer contractor laid the concrete pipe for the northern portion of the system up to the property line dividing Vouga Estates from Kahmann's 5½ acre tract, and at the western edge of the easement granted to Metropolitan St. Louis Sewer District. At that point the end of the 33 or 36 inch pipe was several feet below the surface of the ground, and had nothing further been done the water could not, of course, have been readily discharged from the sewer. In order to alleviate the situation, defendants' sewer contractor, without the knowledge or consent of Kahmann, dug a ditch about 4

feet deep and 6 feet wide across the 170 foot strip comprising the easement granted to the Sewer District. The excavated material was piled to a height of 4 to 6 feet along the northern edge of the ditch, as were numerous trees felled during the digging. Kahmann testified that the obstructions prevented him from reaching the area north of the ditch with the tractor and rotary mower he customarily used to cut the grass. He also testified that defendants' grading contractor while grading the northern portion of defendants' subdivision ran heavy machinery over the northern part of the 5½ acre tract, thereby destroying the grass and creating deep ruts in the denuded ground.

North of the Reutners' garage the ground sloped downward for about 100 feet to a swale, situated approximately at the point on the sketch indicated as manhole B. Sometime after they purchased their property the Reutners joined with Edouard and Jean Vouga in constructing a culvert, with concrete abutments at either end, underneath the 20 foot roadway easement at the low point of the swale. The plan for the storm sewer system for the southern part of Vouga Estates, as prepared by the engineers, provided for the sewer line to run to manhole A, from there to manhole B, and to then connect with the culvert underneath the roadway easement. As shown on the sketch, the manholes and the sewer line between them were located on the west or Vouga side of the roadway easement. During the work of construction the defendants' sewer contractor made two large excavations in the roadway easement for the manholes, the southern one being partly on the Reutners' rock driveway. A ditch was also dug in the easement between the manholes, along the edge of the rock driveway. As a result of the excavations and the mud which spread over the rock driveway, the Reutners' ingress to and egress from their home was totally blocked or interfered with for a period of approximately 90 days. Four delivery trucks or other vehicles which sought to use the driveway became mired in the mud. Reutner had to leave his car parked near Conway Road and traverse the intervening distance on foot. The mud was also washed onto his rock turnaround, and into his garage. Defendants' evidence was that they and their contractor attempted to rehabilitate the driveway after the construction of the manholes and sewer was completed. However, plaintiffs' evidence was that additional rock and work would be required to restore the roadway to its original good condition. The undisputed evidence was that the connection had not been made between manhole B and the pre-existing culvert until about a month .before the trial, held in October, 1960, and that lacking an outlet the water gushed out of the top of manhole B and flowed across the roadway easement, rendering it impassable. The Reutners also introduced evidence that the excavation for manhole B had not been back-filled, which prevented them from driving on the roadway easement at that point, and that the cover of manhole A protruded above the surface of the roadway.

The transcript reveals that by and with the consent of both counsel, and accompanied by them, the court during the course of the trial visited and inspected the properties involved for the purpose, as stated by the court, " * * * to better acquaint the Court with the exact location of the property and the conditions as they exist at the present time."

After making certain findings of fact and conclusions of law the court decreed:

"WHEREFORE, the premises considered, the Court doth order, adjudge and decree:

"1. That the defendants restore the area surrounding manhole B and that the surface of the land and the top of the manhole cover constitute a passable and useable twenty foot easement within the boundaries as determined by the easement in evidence, and that they perform such necessary filling, grading

and other work necessary to restore said easement for use to the full extent of its width and that in the performance of same take whatever measures are necessary to prevent the erroding of such excavated or filled land, or the washing of same onto the roadway easement.

"2. That the plaintiffs Reutner have judgment against the defendants and all of them in the amount of $600.00 for the restoration of the driveway, for $450.00 for the deprivation of the use of the easement for a temporary period, and for $1,000.00 for the diminution in the value of the realty for a total judgment in favor of the plaintiffs Reutner and against the defendants in the sum of $2,050.00.

"3. That the plaintiff Kahmann have judgment against the defendants and all of them for damages for trespass, for the utilization of his property and for the diminution in the value thereof, in the sum of $10,000.00.

"4. That the costs of the action be taxed against the defendants."

■ Defendants interpret the judgment as denying equitable relief to Kahmann. Based on that construction, they argue that the trial court erred in granting Kahmann legal relief, because a court of equity, having denied equitable remedies, cannot retain the case to try purely legal issues. Krummenacher v. Western Auto Supply Co., Mo.App., 206 S.W.2d 991, affirmed 358 Mo. 757, 217 S.W.2d 473; Miller v. St. Louis & Kansas City Ry. Co., 162 Mo. 424, 63 S.W. 85; Dyer v. Union Electric Co., Mo.App., 318 S.W.2d 401. We do not share defendants' interpretation of the judgment. It is true that as one of its conclusions of law the court stated that Kahmann was not entitled to equitable relief. But by the judgment the court in fact granted him such relief. By the first paragraph of the judgment the court ordered the defendants to restore the roadway at man-

hole B to a passable and useable condition for its full width. Nothing therein restricts such relief solely in favor of the Reutners. Actually, repair of the roadway will benefit Kahmann more than the Reutners. This for the reason that the evidence showed that Kahmann's use of this portion of the roadway was greater than that of the Reutners. Kahmann as well as the Reutners sued for equitable relief regarding the roadway. There can be no doubt that the written instrument creating the easement gave him the right to use the roadway. The trial court specifically found that Kahmann had in fact used it and had not (as defendants pleaded) abandoned his rights by failing to use the roadway. Under the pleadings and the evidence the trial court's decision was obviously correct and should not be disturbed on appeal, irrespective of the correctness of any reasons or conclusions it may have stated. City of St. Louis v. Evans, Mo., 337 S.W.2d 948; Producers Produce Co. v. Industrial Commission of Missouri, 365 Mo. 996, 291 S.W.2d 166.

■ Defendants also contend that the trial court erred in holding that they committed a trespass by digging the ditch across Kahmann's land without his permission. They readily concede that they dug the ditch but seek exoneration for their act on the grounds, first, that it was dug on the easement granted to the Metropolitan St. Louis Sewer District; and second, that it was done at the direction and under the supervision of a Sewer District inspector. No authorities are cited by defendants, and we are unaware of any, which would support the novel proposition that if A grants B an easement to build a sewer across his land, C is thereby authorized to do so—or to dig an impassable ditch. As to the second exculpatory grounds offered, the only evidence on that score was the testimony of the sewer contractor's former foreman that an unnamed inspector of the Sewer District told him to dig the ditch. Of course, the trial court may have declined to believe this somewhat nebulous testimony. But even if it be accepted at face value it is

without legal significance for a number of reasons. The easement was granted to the Sewer District, a political subdivision created by the voters of the City and County of St. Louis pursuant to Article VI, Section 30(a) of the Constitution of 1945, V.A.M.S. Petition of City of St. Louis, Mo., 363 S.W. 2d 612; State on Inf. of Dalton v. Metropolitan St. Louis Sewer District, 365 Mo. 1, 275 S.W.2d 225. There is grave doubt whether the Sewer District, by even a written conveyance, could permit the construction of a private sewer on the easement granted it. Missouri-Kansas-Texas R. R. Co. v. Freer, Mo.App., 321 S.W.2d 731. Furthermore, the Sewer District did not do so. A sewer inspector is not the Sewer District, and there was no evidence that it was within the scope of his authority to grant defendants permission to use the easement. Lastly, the easement granted the Sewer District only the right to build a sewer, and if it could convey any right to use its easement it would be solely for that purpose. Defendants did not build a sewer on Kahmann's property, they dug a ditch. While the meaning of the word "sewer" may vary depending upon the context in which it is used, Terminal R. R. Ass'n of St. Louis v. City of Brentwood, Mo., 360 Mo. 777, 230 S.W.2d 768, in the modern concept of the word, and as employed in the conveyance to the Sewer District, the word connotes a subterranean conduit or channel to carry off water or refuse, not a ditch. Fuchs v. City of St. Louis, 167 Mo. 620, 67 S.W. 610. Defendants did not have the slightest legal right to enter upon Kahmann's land and the court very properly held that they had trespassed thereon.

Defendants attack that part of the judgment and decree in which the court awarded Kahmann $10,000 " * * * for trespass, for the utilization of his property and for the diminution in the value thereof." There appears to be no dispute between the parties over the proper measure of damages for a trespass. As stated in Welker v.

Pankey, Mo.App., 225 S.W.2d 505, 508, the rule is that:

" * * * In a case of trespass upon land damages are measured by the depreciation in the value of the land where such value has depreciated by reason of the trespass; but, where the property can be restored and the cost of restoring is less than the depreciation caused, then the lower amount is the measure of damages. There should, of course, be added to the cost of restoring the land such actual damages as the owner may have suffered by the loss of use where that is shown by the evidence. Young v. Home Telephone Co., Mo.App., 201 S.W. 635; Sperry v. Hurd, 267 Mo. 628, 185 S.W. 170; Tegler et ux. v. Kansas City, 95 Mo.App. 162, 68 S.W. 953; Reed v. Peck et al., 163 Mo. 333, 63 S.W. 734; Smith v. Kansas City, 128 Mo. 23, 30 S.W. 314."

What defendants contend is that there was insufficient evidence on either standard to support the amount awarded Kahmann. As to that of depreciation in value, their argument is based on a misconstruction of the testimony of O'Toole, the plaintiffs' expert witness. In answering a question calling for his opinion on the value of Kahmann's land " * * * without that excavation and ditch in there," O'Toole used the phrase " * * * without the present storm water runoff or sewer easement * * *." Defendants argue that by the word "easement" O'Toole referred to the written easement granted to the Sewer District, and contend that they should not be held liable for that part of the depreciation in value attributable to that grant. A fair reading of O'Toole's entire testimony, as well as the passage in question, clearly shows that he was referring to the depreciation in value resulting from the ditch dug by defendants. That figure, in his opinion, was $15,500.

■ However, defendants are on firmer ground on their claim that no evidence was

introduced as to the cost of restoring Kahmann's land. As they state in their brief:

> "Plaintiff Kahmann's land could be restored simply by filling in the ditch. There is no evidence in the record concerning what the cost of this restoration would be. Plaintiff Kahmann has therefore failed to prove an essential element of his case. He cannot ask the court to assume that the cost of restoration would exceed the decrease in market value; if (as seems probable) the cost of filling in the ditch would be less than the decrease in market value caused by the ditch, then Kahmann's recovery should be no more than the cost of restoration. * * *"

The rule quoted above contemplates the restoration of the land in the physical sense. Apparently Kahmann's theory of restoration was that of restoring the *value* of the land. To that end he introduced evidence that the value of his property could be partially restored by constructing a sewer to connect with defendants' outlet, and to run across his land to Deer Creek, at a cost of $9500. O'Toole also testified that even though the proposed sewer was constructed the value of Kahmann's northern 4 acres would remain diminished and would be worth $6,000 less than their value prior to defendants' trespass. Kahmann's theory involved mitigation of damages, not the physical restoration of the property. If tenable at all, it would be only on the basis that it would result in an amount lower than both the depreciation in value and the cost of restoration. But the fact remains, as the defendants point out, that no evidence was introduced of the cost of filling in the ditch and otherwise restoring Kahmann's land to its pre-existing condition. For aught that appears in the record such damages may be substantially less than the $15,500 claimed by Kahmann or the $10,000 allowed by the court.

█ Upon appeal, we try an equitable action de novo, and may render or direct the entry of such judgment as the trial court should have rendered. Anison v. Rice, Mo., 282 S.W.2d 497; Bobst v. Sons, Mo., 252 S.W.2d 303; Missouri Cafeteria v. McVey, 362 Mo. 583, 242 S.W.2d 549. In the absence of evidence as to the cost of restoring Kahmann's land, and of any damages for his loss of use, it is obviously impossible for us to finally dispose of the case, and it must be remanded for the purpose of determining, in accordance with the foregoing rules, the proper amount of monetary damages to which Kahmann is entitled.

█ However, if (as defendants contend), the cost of restoration, together with such actual damages as Kahmann may have suffered by the loss of use of his property, is lower than the depreciation in value, then another factor must be considered. Restoration by filling in the ditch, grading, seeding, or sodding, and, if necessary, fertilizing, may restore Kahmann's land to its prior physical condition but it will not dispose of the water which will be discharged upon, against and under Kahmann's property. Under the common law rule, or "common enemy doctrine," each landowner has an unqualified right, by operations on his own land, to fend off surface waters as he sees fit without being required to take into account the consequences to other landowners, who have the duty and right to protect themselves as best they can, 51 Central Law Journal, 360; Haferkamp v. City of Rock Hill, Mo., 316 S.W.2d 620. "* * * Missouri has, however, as has all or substantially all of the other states purporting to follow the common enemy doctrine, modified the harshness of that doctrine. * * *" Haferkamp v. City of Rock Hill, supra, l. c. 625. Thus it is said that the rights exercised under the "common enemy" doctrine must be exercised within reasonable limits and not recklessly, so as not to needlessly injure the servient tenements. Young v. Moore, 241 Mo.App. 436, 236 S.W.2d 740, 744. And the courts have repeatedly held that one may not artificially collect and impound surface water and cast it in concentrated

**42**

and destructive quantities at one point onto the servient estate. Blydenburgh v. Amelung, Mo.App., 309 S.W.2d 150; Clark v. City of Springfield, Mo.App., 241 S.W.2d 100. It is apparent from the evidence that defendants are collecting surface water through their catch basins, concentrating it through their sewer system, and casting it in destructive quantities at one point onto Kahmann's land. Their own witness, Wunnenberg, a registered professional engineer from the engineering firm which designed their sewer system, testified that the effect of such concentration is to increase the velocity of the water and to cause it to wash more at the point of discharge; a result which he admitted was already occurring on Kahmann's land.

▮ In his petition Kahmann alleged that the concentrated discharge of water by defendants would cause irreparable and irremediable damage to his property and (by a general prayer) asked for equitable relief. The trial court found that the defendants had trespassed, that Kahmann's land had been damaged, and that it had been depreciated in value, but that such damages were not irreparable and were compensable in money damages. It is apparent that the court denied Kahmann an injunction on the theory that his land could not be restored and that the ditch would remain to carry off the water discharged from defendants' sewer. Defendant must take the bitter with the sweet. If on a retrial the evidence shows that the cost of restoration plus any damages for loss of use is lower than the depreciation in value, and Kahmann is awarded only the lower amount, then in all equity and good conscience the defendants should be restrained and enjoined from discharging water collected through their sewer system upon, against, and under Kahmann's land. Anderson v. City of Jefferson City, Mo.App., 262 S.W.2d 169, Polich v. Hermann, Mo.App., 219 S.W.2d 849.

▮ Defendants likewise complain of that part of the judgment and decree by which the Reutners were allowed monetary damages of " * * * $600 for the restoration of the driveway, for $450.00 for the deprivation of the use of the easement for a temporary period, and for $1,000.00 for the diminution in the value of the realty," a total of $2,050.00. Defendants assail the last item on the grounds that there was no evidence to support the award of $1,000 on any legal theory. The Reutners seek to sustain this element of their damages on the basis of O'Toole's testimony that the existence of manhole B, its connection with the pre-existing culvert under the roadway, and a new concrete inlet to the culvert, would depreciate the value of the Reutners' property in the amount of $1672.00. But as the evidence showed, and as the court found, all of such installations were constructed on the western 10 feet of the 20 foot easement and on the land the fee to which is vested in the defendants, other than Arnold Vouga. All that the written conveyance did, so far as defendants were concerned, was to burden their 10 feet with an easement for roadway purposes in favor of the owners of the eastern 10 feet, including the Reutners as grantees. Defendants remained the owners of their 10 feet and as such had the right to use it for any lawful purpose not inconsistent with the Reutners' enjoyment of their easement. Goddard on Easements (Amer. Ed.) p. 280; 28 C.J.S. Easements § 91, pp. 770, 771; State ex rel. Appel v. Hughes, 351 Mo. 488, 173 S.W.2d 45; Tracy v. Klausmeyer, Mo. App., 305 S.W.2d 84. Generally speaking, as an incident of ownership an owner of land has the lawful right to use his property in any lawful manner and for any lawful purpose. Casanover v. Villanova Realty Co., Mo.App., 209 S.W.2d 556; Clinic & Hospital, Inc. v. McConnell, Mo.App., 236 S.W.2d 384; 73 C.J.S. Property § 13, pp. 192, 193. In the absence of any zoning or other legal restrictions to the contrary, defendants had a lawful right to construct the structures on and beneath the surface of their land. It is difficult to see how the presence of such structures on and beneath the surface of defendants' land would de-

preciate the value of the Reutners' property. But if, from aesthetic considerations, such was the case, the damage was damnum absque injuria.

 Defendants' remaining points are that the amount of $450 for the interference of the Reutners' use of the roadway was excessive; and that the award to them of $600 for restoration of their driveway was erroneous because *defendants'* evidence showed that it had been restored. There is no merit to either point. The amount allowable for interference was not one determinable by any mathematical formula, and lay within the sound judicial discretion of the court. Taking into account the period of interference, the inconvenience which resulted, and other circumstances detailed in evidence we are of the opinion that the trial court did not abuse its discretion. As to the final point, the question of whether additional rock and work was needed to restore the Reutners' driveway to its original condition was a disputed issue of fact. Plaintiff introduced evidence that such repairs were required, and that they would cost from $400 to $600. Defendants' evidence was to the contrary. Obviously, the court believed plaintiffs' evidence and rejected that of defendants, as it had a right to do. In the absence of an overwhelming weight of the evidence to the contrary, we defer to the court's finding, particularly where, as here, the judge made a personal inspection of the property involved. Anderson v. City of Jefferson City, Mo.App., 262 S.W.2d 169.

■ That part of the judgment and decree awarding plaintiff Kahmann monetary damages of $10,000, and that part awarding plaintiffs Reutner $1,000 for the diminution in value of their realty, should be reversed and set aside, and the cause should be remanded with directions to hear evidence and to determine the proper amount of monetary damages to be awarded to plaintiff Kahmann; should the court find that the cost of restoring Kahmann's land, together with such actual damages as he may have suffered by the loss of its use, is lower than the depreciation in value by reason of defendants' trespass, and enter judgment for such lower amount, then the court should enjoin and restrain the defendants from discharging the surface water from their sewer system upon, against and under Kahmann's land.

The Commissioner so recommends.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of the court.

Accordingly, the cause is reversed and remanded with directions.

RUDDY, Acting P. J., and SAM C. BLAIR and PHIL H. COOK, Special Judges, concur.