William B. GLUCK, et al., Respondents,

v.

**TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, Appellant.**

No. 67067.

Supreme Court of Missouri,
En Banc.

Jan. 15, 1986.

Robert C. Ely, Joseph J. Simeone, St. Louis, for appellant.

Kenneth A. Leeds, Charles F. Dufour, St. Louis, for respondents.

James W. Erwin, Donald J. Stohr, St. Louis, James E. Darst, Brentwood, amicus curiae, for Metropolitan St. Louis Sewer Dist.

WELLIVER, Judge.

This is an appeal from a trial court order mandating that appellant, Terminal Railroad Association of St. Louis (TRRA), alter its existing culvert at its right of way on West Point Drive at the East Fork of Black Creek in Maplewood, Missouri. Respondents initiated this equitable action under § 389.660, RSMo 1978 seeking a mandatory injunction against appellant. The trial court issued the injunction. On appeal, appellant's principal argument is that § 389.660 is superseded by the adoption of the Metropolitan St. Louis Sewer District

(MSD) and does not apply in St. Louis County. The court of appeals held that the statute was not inconsistent with the creation of MSD, but the court reversed and remanded the cause for the joinder of MSD as a necessary party to the suit. MSD, thereupon, filed both a motion for rehearing as an amicus and a motion to intervene. We ordered transfer and decide the case as if on original appeal. Mo. Const. art. V, § 10. We affirm.

At the beginning of the century, TRRA acquired the right of way to build a track over the East Fork of Black Creek, north of what is now West Point Drive and west of Laclede Station Road. In order to prevent obstructing the flow of the creek, TRRA constructed a culvert under the track in 1903. They cast the structure out of concrete. The culvert has undergone only minor changes since its construction, and it now stands 10 feet wide, with 6 feet vertical sides and has a semicircular top having a radius of 5 feet. At its highest point at the arched center, the culvert is 11.1 feet high and is skewed on an angle in a southwesternly direction. It is about 200 feet long and has an opening of between 100 and 110 square feet. The railroad track lies slightly downstream from and about 25 to 30 feet above the culvert.

Respondents' properties lie adjacent to and upstream from the culvert, and they claim that during heavy rains the water in the watercourse floods their property. Alleging that the opening of the culvert is insufficient to accommodate the water flow, respondents brought this equitable action under § 389.660, RSMo 1978,[1] which

1. **389.660. Right-of-way to be drained, clear of vegetation—crossings to be clear of visual obstructions—injunctive relief, damages and penalties, when.—1.** It shall be the duty of every corporation, company or person owning or operating any railroad or branch thereof in this state, and of any corporation, company or person constructing any railroad in this state, within three months after the completion of the same through any county in this state, to cause to be constructed and maintained suitable openings across and through the right-of-way and roadbed of such railroad, and suitable ditches and drains along the roadbed of such railroad, to connect with ditches, drains and watercours- es, so as to afford sufficient outlet to drain and carry off the water, including surface water, along such railroad whenever the draining of such water has been obstructed or rendered necessary by the construction of such railroad; any person owning land adjoining such railroad where such ditches or drains are necessary is authorized to require the railroad company to construct and maintain such ditches or drains by an action against the railroad company for a mandatory injunction and in case such corporation, company or person shall fail or neglect to construct and maintain such ditches or drains within the time limited in this chapter, any person owning land adjoining such railroad

requires that a railroad provide an adequate opening through a railbed to allow the water to flow unobstructed. The trial court heard substantial evidence indicating that these properties flood approximately three times a year causing considerable damage to respondents' real and personal property. The flooding in this area already has been the subject of a previous lawsuit. See Ogle v. Terminal R.R. Ass'n of St. Louis, 534 S.W.2d 809 (Mo.App.1976).

Respondents elicited testimony from expert witnesses that the culvert has a current capacity to accommodate 1,100 cubic feet of water per second (c.f.s.), but that at a flood stage an opening capable of accommodating 3,275 c.f.s. is required to carry off the water. James W. Thompson, an Assistant Plan Review Engineer for MSD, testified that MSD has been studying the watershed since the early 1960s. According to Thompson, MSD design criteria would require that the culvert be enlarged to accommodate 3,275 c.f.s. Glenn E. Borgard, the vice-president of a civil engineering consulting firm, also testified. MSD engaged his firm to conduct a stormwater management study for the Black Creek watershed. The study was completed in the fall of 1980, and it concluded in part that approximately 3,300 c.f.s. was presented to the culvert while the current capacity of the culvert is inadequate to handle a severe rainfall. Borgard stated that the "culvert was restrictive in the flow of [water] in [the] channel ... [at] that location." His firm assigned a high priority to this particular project out of approximately 118 different drainage problems in this watershed.

Appellant virtually concedes that the opening in the culvert is inadequate, but tried to persuade the trial court that a mandatory injunction is not warranted. First, appellant argued that widening the culvert would not solve the serious flooding problem. Either water backing up from a flood stage downstream would impede any substantial increase in water flow through a wider culvert or excess water flowing through a new culvert would increase the flooding downstream. Appellant offered the testimony of a consulting engineer, Henry M. Reitz. Reitz testified that it was possible that downstream from the culvert the water was backing up and creating a higher water level downstream than upstream. Under these circumstances, he explained, "the presence of the culvert or the size of the culvert or its capacity would really not be material." A higher water level downstream would mean "there'd be a slight tendency for reversal to flow back upstream through the culvert." If the water level was about equal on both sides of the culvert, the size of the culvert would not appreciably affect the flooding upstream, according to Reitz. Appellant had adopted this same approach to the problem back in 1948, when it recognized that the culvert was too small but observed that enlarging the culvert would not prevent the flooding because water was backing up downstream from the culvert. TRRA again expressed this sentiment in 1957 and suggested that the Sewer District was in the best position to resolve the situation.

Appellant's next defense before the trial court was that § 389.660 is superseded by the adoption of the Metropolitan St. Louis Sewer District. TRRA argued that only MSD is capable of assessing the problem and taking into account the effect on the entire watershed both upstream and down-

where such ditches or drains are necessary is hereby authorized, after giving thirty days' notice, in writing, to such owner or operator of said railroad, by service upon the nearest station agent or section foreman, to cause such ditches, drains, openings, culverts or trestles to be constructed and maintained, and such landowner may maintain an action against such corporation, company or person so failing to construct and maintain such ditches or drains, in any court of competent jurisdiction, and shall

be entitled to recover all costs, expenses and damages incurred and accruing in the construction and maintenance of or damages for failure to construct and maintain such ditches, drains, openings, culverts or trestles which actions for damages and for mandatory injunction under this subsection shall be the only remedies maintainable against a railroad company for its failure to construct and maintain suitable ditches and drains.

stream from the culvert. Thompson testified that before any work could be done, TRRA would have to receive MSD approval. Appellant, therefore, argued to the court that only the Sewer District could examine the entire situation, and any piecemeal approach would be inconsistent with the reason for adopting MSD and that the adoption of MSD superseded all laws inconsistent with its adoption.

Lastly, appellant presented evidence that if it was required to enlarge the opening of the culvert, it might choose to remove the culvert and abandon that line of track. The chief engineer for TRRA testified that the cost of enlarging the culvert would be at least $500,000. He further testified that the company only received a profit of around $35,000 a year from serving the businesses along this segment of the line.[2]

After hearing the evidence, the trial court entered its findings of fact and conclusions of law. The trial court found that the opening in the culvert is inadequate and as such presents "a serious obstruction to the flow of the creek and causes greater flooding problems than would exist if Black Creek were free to flow." The court further found that the water backs up upstream, and has caused extensive flooding resulting in real and personal property damage. In its conclusions of law, the court found that appellant had not complied with its statutory duty under § 389.660, that the adoption of and ordinances passed by MSD neither conflicted with § 389.660 nor precluded others from making improvements when MSD could have exercised its jurisdiction. The court, thereupon, ordered that appellant create an opening across and through its right of way and roadbed that would carry, without obstruction, not less

than 3,300 c.f.s. through the opening or openings.[3]

We note at the outset that this case involves a statutorily granted right to a mandatory injunction, and the legislature did not contemplate that our rules governing the issuance of writs be followed. Rather, the cause is to be initiated in the circuit court and is subject to appeal through the customary process. The initial and crucial question on appeal is whether § 389.660 is superseded by the constitutionally authorized adoption of the Sewer District.

The predecessors of § 389.660 can be traced back well into the nineteenth century. *See e.g.,* 1851 Mo. Laws, at 451; 1874 Mo. Laws, at 121. The reason for adopting such laws stems, no doubt, from the ancient common law doctrine concerning surface water. The old common law rule, referred to as the common enemy doctrine, provided that "each landowner has an unqualified right, by operations on his own land, to fend off surface water as he sees fit without being required to take into account the consequences to other landowners, who have the duty and right to protect themselves as best they can." *Reutner v. Vouga,* 367 S.W.2d 34, 41 (Mo. App.1963). *See generally Goll v. Chicago & A. Ry. Co.,* 271 Mo. 655, 197 S.W. 244 (1916). Overflow waters were treated as "surface water." Missouri, however, along with most other jurisdictions, modified the harshness of this doctrine. Yet it was the struggle to arrive at a fair and workable common law approach coupled with the growth of the railroad industry that led the legislature in 1874 to establish a rule of liability. *See generally* Snodgrass & Davis, The Law of Surface Water in Missouri,

---

**2.** Appellant also argued that an injunction would run afoul of the dormant commerce clause to the United States Constitution. While we believe that such an argument lacks merit, we need not decide the point because appellant has not argued the issue to this Court and is deemed to have abandoned its challenge on this ground.

**3.** The court issued an interlocutory judgment retaining jurisdiction to rule on respondents'

request for costs and attorney fees. In a subsequent order, the court awarded respondents costs and expenses but denied the request for attorney fees. Both parties appealed from this subsequent judgment. There was a motion to dismiss the cross-appeal. All three cases were consolidated in the court of appeals and, although the parties have not discussed these separate appeals, we have left the cases consolidated.

24 Mo.L.Rev. 281, 286–88 (1959); *White v. Wabash R. Co.*, 207 S.W.2d 505, 508–09 (Mo.App.1947); *Murphy v. St. Louis-San Francisco R. Co.*, 205 Mo.App. 682, 226 S.W. 637 (1920).[4]

During this last century, considerable case law interpreting the statute has developed. In *Jones v. Chicago, B. & Q. R. Co.*, 343 Mo. 1104, 125 S.W.2d 5 (1938), this Court aptly summarized the general rule:

Now under the plain terms of the statute it is made the duty of a railroad company to construct and maintain suitable openings across and through its right of way and roadbed so as to afford sufficient outlets to drain and carry off the water, including surface water, along such railroad, whenever the drainage of such water has been obstructed or rendered necessary by the construction of the railroad. In other words, a railroad company must construct sufficient openings, trestles, or bridges to permit the waters of a natural watercourse to escape through its embankment and thereby connect with their natural outlet, if, as in this case, such a natural, outlet exists; and so far as the term "surface water" is concerned, it includes that overflowing from a stream or watercourse as well as that falling as rain upon the surface of the land.

*Jones v. Chicago, B. & Q. R. Co., supra,* 125 S.W.2d at 13. *See also Cox v. Hannibal & St. Joseph R. Co.*, 174 Mo. 588, 74 S.W. 854 (1903); *Wells v. Payne*, 235 S.W. 488 (Mo.App.1921); *Riffe v. Wabash R. Co.*, 200 Mo.App. 397, 207 S.W. 78 (1918). In damage actions, the inadequacy of other outlets is no defense, and it is a question of fact whether the opening is large enough to permit water to flow in sufficient quantities to prevent flooding. *See generally Smithpeter v. Wabash*, 360 Mo. 835, 231 S.W.2d 135, 141–43 (banc 1950); *Wells v. Payne, supra,* at 490. *See also Brown v.*

St. Louis-San Francisco R. Co., 212 Mo. App. 541, 248 S.W. 12 (1923). Mandatory injunction is also an appropriate remedy for enforcement of the provisions of § 389.660, as the statute explicitly authorizes such an action.

Appellant claims that its duty under this statute was superseded when the people adopted the Metropolitan St. Louis Sewer District. Section 30, article VI of the Missouri Constitution authorizes "[t]he people of the city of St. Louis and the people of the county of St. Louis ... to establish a metropolitan district or districts for the functional administration of services common to the areas included therein." The Constitution further provides:

[T]he same shall become the organic law of the territory therein defined, and shall take the place of and supersede all laws, charter provisions and ordinances inconsistent therewith relating to said territory.

Mo. Const. art. VI, § 30(b). Following the second World War and in the midst of growing health hazard, the St. Louis and St. Louis County Board of Freeholders submitted a proposed plan of the Metropolitan St. Louis Sewer District to the Voters of St. Louis and St. Louis County. The people were told that "[h]ealth authorities, contractors, engineers, and the staffs of both the City and County law departments are in accord that the sewer problems should be handled on a watershed basis rather than according to arbitrary boundaries of county, city, village, or sewer district." Proposed Plan of the Metropolitan St. Louis Sewer District ii (1954). The Plan was adopted on February 9, 1954, and this Court has upheld the constitutionality of the Plan. *See State v. Metropolitan St. Louis Sewer District,* 365 Mo. 1, 275 S.W.2d 225 (banc 1955). At that time, this Court recognized that the plan supersedes

---

4. Of course, the statute has undergone some minor modifications since its first enactment, occasionally in response to an opinion by this Court. The most recent change occurred in 1976 in response to *Hawkins v. Burlington Northern, Inc.*, 514 S.W.2d 593 (Mo.1974). *See*

*Central Nat. Ins. Co. v. City of Kansas City, Mo.,* 546 F.Supp. 1237, 1242–44 (W.D.Mo.1982). It might be noted that the language expressly authorizing a suit for a mandatory injunction was inserted during this last legislative amendment.

conflicting laws, and we later held that St. Louis could no longer exercise the same power, jurisdiction and control over the sewers that it previously exercised. *State v. Metropolitan St. Louis Sewer District, supra,* 275 S.W.2d at 228; *Petition of City of St. Louis,* 363 S.W.2d 612, 616 (Mo. banc 1963). *See also Metropolitan St. Louis Sewer District v. Zykan,* 495 S.W.2d 643, 652 (Mo.1973).

The parties do not contest the application of the MSD plan. The watershed in question is clearly within the jurisdiction of MSD and the ordinances lawfully passed by MSD. MSD also has the power to enter and work on the culvert. *See* Plan, art. III, §§ 3.020(3) and 3.030. More importantly, before any work could be performed on the culvert, MSD has the power to "approve, revise, or reject the plans and design of all ... storm water drains ... [and] [n]o such sewer or drainage facilities shall be constructed or reconstructed without the approval of the District. Any such work shall be subject to inspection and supervision of the District." Plan, art. III, § 3.020(19).

■ We do not believe that either the policy behind the adoption of MSD or any of the ordinances passed thereunder and directed to the trial court's attention[5] is necessarily *inconsistent* with § 389.660. This aspect of the statute only focuses on alleviating an obstruction in a watercourse and gives adjoining property owners a remedy,[6] and the MSD plan clearly contemplates that others may perform construction subject to MSD approval. The two are not necessarily inconsistent. Appellant argues that a mandatory injunction is not possible because it would be contingent upon MSD approval. Under the unique

facts and circumstances of this case, we do not agree.

■ MSD has filed a motion to intervene, which this Court now sustains. Through its motion and amicus brief, we treat MSD as having given its consent to any construction undertaken by appellant as long as said construction complies with the trial court order and meets MSD's engineering standards.[7] We do recognize that since standards of MSD must be met and inspections made, there must be an ongoing relationship between MSD and appellant, all subject to the continuing jurisdiction of the trial court to enforce its original injunctive order.

Having decided that the trial court did not erroneously declare or apply the law and that its order is not against the weight of evidence, *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976), the order of the trial court is affirmed to the extent that it requires appellant to create an opening or openings sufficient to accommodate 3,300 c.f.s. The trial court order entered on May 14, 1984 is affirmed to the extent that it denies the request for attorney fees and grants certain costs to respondents.

The judgment of the trial court ordering injunctive relief is affirmed and the cause remanded for execution and enforcement of the injunction and for any other necessary further proceedings consistent with this opinion.

All concur.

---

**5.** The trial court was asked to take judicial notice of the MSD plan and certain ordinances passed under the plan.

**6.** In its amicus brief, MSD notes that it is a defendant in a number of currently pending cases where landowners are apparently seeking relief against MSD. *See e.g., Central Nat. Ins. Co. v. City of Kansas City, Mo.,* 546 F.Supp. 1237 (W.D.Mo.1982). *See also State ex rel. Metropolitan St. Louis Sewer District v. Hoester,* 661 S.W.2d 819 (Mo.App.1983). That issue is not

before this Court and we decline to render any comment.

**7.** We treat MSD's representations to this Court to mean that if appellant's solution allowed 3,300 c.f.s. to flow through the culvert that would satisfy MSD's design criteria, and MSD would only have to approve engineering standards. Should MSD change its position, we recognize that the trial court would, of necessity, be required to hear additional evidence to alter its order accordingly.