William Douglas ZWEIG, et al., Respondents/Cross–Appellants,

v.

The METROPOLITAN ST. LOUIS SEWER DISTRICT, Appellant/Cross–Respondent.

No. SC 92581.

Supreme Court of Missouri, En Banc.

Nov. 12, 2013.

John L. Gianoulakis, Robert F. Murray and Kevin A. Sullivan of Kohn, Shands, Elbert, Gianoulakis & Giljum LLP in St. Louis, and Susan M. Myers, St. Louis, for Metropolitan St. Louis Sewer District.

Richard R. Hardcastle III, Erwin O. Switzer, Kirsten M. Ahmad and George A. Uhl of Greensfelder, Hemker & Gale PC, St. Louis, for the ratepayers.

PAUL C. WILSON, Judge.

William Zweig and the other named plaintiffs, on behalf of themselves and a class of similarly situated ratepayers ("Ratepayers"), sued the Metropolitan St. Louis Sewer District ("MSD") seeking declaratory, injunctive, and monetary remedies on the ground that MSD violated article X, section 22(a) of the Missouri Constitution when it implemented its "stormwater user charge" without prior voter approval. The trial court declared MSD's action unconstitutional, enjoined future collection of the charge, and ordered MSD to pay the Ratepayers' attorneys' fees and other expenses. The trial court, however, refused to order MSD to pay damages or refund charges already collected.

MSD appeals the trial court's decision on Ratepayers' constitutional claim and the award of Ratepayers' attorneys' fees and expenses. Ratepayers cross-appeal, claiming that the trial court erred in refusing to enter a money judgment against MSD for the amounts already collected. This Court granted transfer pursuant to Rule 83.04, has jurisdiction under Missouri Constitution article V, section 10, and affirms the trial court's judgment in all respects.

■ Article X, section 22(a) of the Missouri Constitution prohibits political subdivisions "from levying any [new or increased] tax, license or fees" without prior voter approval. Despite the breadth of this language, section 22(a) does not prohibit a political subdivision from charging an individual user a fee in exchange for rendering a service to that user, so long as this charge is not simply a tax by another name. *Keller v. Marion County Ambulance District*, 820 S.W.2d 301, 305 (Mo. banc 1991).

Under *Keller*, therefore, charges imposed by a political subdivision are separated into two species: (1) "taxes," which include "licenses and fees" and other levied charges; and (2) "user fees," which are charged for an individual's use of the political subdivision's service. Section 22(a) requires the political subdivision to obtain prior voter approval for the former, but not the latter. *Keller* offers five criteria intended to be "helpful" in telling these two species apart. *Id.* at 304 n. 10. However, a tax by any other name remains a tax. It cannot be transformed into a user

fee by adept packaging, any more than a zoologist can transform a horse into a zebra with a bucket of paint. Here, no matter how many stripes MSD paints on it, the stormwater user charge is not a user fee.

MSD concedes that the stormwater fee is not charged in exchange for an individual landowner's "use" of MSD's drainage system (i.e., discharging stormwater into that system during a rainstorm) or that landowner's "use" of MSD's oversight functions (i.e., receiving a particular stormwater inspection, permit, or educational program). MSD admits that it has no way to measure each landowner's discharge into its drainage system during a storm. Even if it could measure such usage, MSD contends that a fee based on such use would be both impracticable and unfair because some of the landowners who discharge stormwater into the drainage system play no part in creating the need for stormwater services while others who contribute to the need for such services do not use MSD's drainage system. Accordingly, MSD does not claim that the stormwater charge is a user fee paid for MSD's service of providing a stormwater drainage system during rainstorms or providing its stormwater oversight functions on request.

Instead, MSD claims that the stormwater charge is a user fee paid for MSD's service of ensuring the "continuous and ongoing" availability of its stormwater drainage system (and oversight functions), rain or shine. Despite this novel characterization, the basic flaw in MSD's argument remains that a user fee must be charged in exchange for, and based upon, an individual's use of the relevant service. Here, no matter how MSD characterizes its service, the stormwater fee is not charged in exchange for, nor is it based on, each individual Ratepayer's use of that service. No Ratepayer uses MSD's ser-

vice (i.e., ensuring the "continuous and ongoing" availability of stormwater drainage and oversight functions) any more or less than any other Ratepayer, and Ratepayers do not use such a service any more or less than the rest of the landowners and non-landowners throughout the district. Instead, the only true user of such an "availability" service is the district as a whole, not individual landowners or subsets of landowners.

MSD responds that the stormwater charge should be classified as a user fee because it is based on each landowner's individual contribution to the overall need for MSD's stormwater services. MSD argues that only those landowners whose properties contain unnatural surfaces impervious to stormwater are responsible, *collectively,* for creating the need for stormwater services throughout the district. As a result, MSD insists that this subset of landowners, *collectively,* must bear all of the costs of MSD's ensuring such services are available whenever needed. Nothing in *Keller* or MSD's arguments, however, justifies equating an individual's contribution to the total need for a service with that individual's use of that service for purposes of determining whether a charge is a user fee.

MSD insists that a tax based on the assessed valuation of a property has no relation to stormwater services, but a stormwater user charge directed at the landowners who, collectively, create the need for stormwater services is much fairer and more easily understood. This may be so, but it also is irrelevant. A tax need not be tied to the payer's use of the political subdivision's service, but a user fee must be. A charge based on contributing to the need for (rather than the actual use of) a service might be fair and easily understood, but it cannot be a user fee. Accordingly, MSD's decision to implement

the stormwater user charge without voter approval violated section 22(a).

### FACTS

Voters in City of St. Louis and parts of St. Louis County created MSD in 1954 when they ratified MSD's charter ("Plan") pursuant to article VI, section 30(a) of the Missouri Constitution. MSD's purpose is stated in the first section of the Plan: "In the interest of public health and for the purpose of providing adequate sewer *and drainage* facilities . . . there is hereby established a metropolitan sewer district[.]" [Emphasis added.]

After the Plan was approved, MSD assumed ownership of and control over all publicly owned sewer and stormwater facilities throughout the district. When voters expanded the district in 1977, however, MSD decided that it would not acquire all stormwater facilities in the newly annexed area. Instead, MSD determined that (if asked) it would help plan and coordinate stormwater programs already in existence. MSD changed this policy in 1989 when it announced that it would regulate all stormwater facilities throughout the district and would assume ownership of and control over designated facilities as funds became available.

MSD's basic stormwater services are to operate and maintain a stormwater drainage system and to provide certain stormwater oversight functions such as planning, permitting, and public education. MSD's stormwater drainage system is not analogous to its sewer operations. To use MSD's sewer system, a landowner must have a physical connection to that system.

But a landowner needs no physical connection to MSD's stormwater drainage system for stormwater falling on that owner's property to flow through MSD's system on its way to the Mississippi River and the Gulf of Mexico.

MSD's stormwater drainage system is a combination of natural and artificial waterways, open and closed. Stormwater enters this system through natural aggregation and numerous trapped and un-trapped inlets. Before entering MSD's drainage system, however, most stormwater passes through natural or artificial collection devices such as curbs, gutters, culverts, or trenches. MSD does not operate or maintain these parts of the stormwater drainage system, which usually are owned (and maintained, if at all) by the Missouri Department of Transportation, local municipalities, or individual landowners.

Not all of the rain that falls in the district flows through MSD's drainage system. Some of it is held on or absorbed by the land, and some drains directly into major rivers or is handled by local levee districts. Of the stormwater that drains through MSD's system, MSD cannot tell where the water originates or how much stormwater each property discharges into the system during a particular storm or over any period of time.[1]

MSD's stormwater oversight functions are separate and distinct from its operation and maintenance of the stormwater drainage system. With the expansion of state and federal environmental laws, MSD has been given expanded responsibility for an increasing array of stormwater

---

1. A single drop of rain may fall on A's property, *join other drops and flow downhill onto* B's property, join other drops on B's land and flow downhill onto C's property, flow down C's driveway, into a city street, along the gutter, and down a storm drain before entering the stormwater system that MSD operates and maintains. Even if MSD could tell how *much of the stormwater entering its system is* from C's land, which it cannot, it has no way of determining how much of that water fell on A's or B's property uphill from C and merely flowed over C's property on its way to MSD's drainage system.

planning, permitting, and public education functions.

MSD's powers are limited to those set forth and approved by the voters in the Plan and such implied powers as may be necessary to achieve MSD's purposes. *St. Louis Inv. Properties, Inc. v. Metropolitan St. Louis Sewer Dist.*, 873 S.W.2d 303, 307 (Mo.App.1994). MSD's ability to fund its activities also is limited. Article VI, section 30(b) of the Missouri Constitution provides: "The plan shall provide for the assessment and taxation of real estate ... giving due regard to the other provisions of this constitution." Under the Plan, MSD has the power to: (a) levy property taxes, provided the total levy for maintenance and operation does not exceed $0.10 per $100 assessed valuation; (b) levy special assessments for the construction, improvement, or extension of specific sewer or drainage facilities; and (c) establish a schedule of "rates, rentals, and other charges, to be collected from all the real property served by the sewer facilities of the District...."[2]

Before implementing the stormwater user charge at issue here, MSD funded its stormwater operations with a combination of taxes. MSD levied taxes on all real property in the district in the amount of $0.02 per $100 assessed valuation and, for property within the district's original boundaries, an additional $0.05 tax per $100 assessed valuation. These *ad valorem* taxes generated approximately $12.3 million in 2007. MSD also levied a $0.24 monthly surcharge for stormwater operations on each of its sewer customers.[3] This charge generated an additional $1.2 million in 2007, raising MSD's stormwater tax receipts for that year to approximately $13.5 million.[4]

These revenues, however, were not sufficient. In 2007, MSD spent nearly $33 million on its stormwater operations, which required MSD to subsidize its stormwater operations with $19 million from its sewer revenues. MSD insisted that this subsidy was not sustainable and, even if it was, a $33 million budget was not adequate to fund the range of stormwater drainage and oversight services MSD believes are required. Without more revenue, MSD claimed that repairs would continue to be performed only on an emergency (rather than preventative) basis and infrastructure improvements would be constructed only in sub-districts with adequate revenues. In addition, MSD insisted that its stormwater revenue scheme of *ad valorem* taxes and sewer surcharges was unfair because

2. Ratepayers do not challenge MSD's authority to levy the stormwater user charge under the Plan or section 30(b) of the constitution. The only claim in this case—and the only issue decided here—is whether section 22(a) prohibits MSD from levying this stormwater user charge without prior voter approval.

3. MSD levied its stormwater *ad valorem* taxes in 1954, long before the Hancock Amendment was adopted. Therefore, section 22(a)'s voter approval requirement did not apply. MSD levied the stormwater surcharge on its sewer users in 1988, however, and district voters approved that tax pursuant to section 22(a). Tax-exempt entities did not pay MSD's *ad valorem* taxes but appear to have paid the sewer surcharge without challenge.

4. MSD also created (with voter approval) 23 sub-districts and levied additional property taxes of between $0.04 and $0.10 per $100 assessed valuation in each sub-district. These taxes were used for capital improvements within each sub-district and, collectively, generated more than $8 million in 2007. As part of its 2007 plan, MSD proposed to seek voter approval to expand these sub-districts, combine them into five watershed sub-districts, and increase all of the taxes to $0.10 per $100 assessed valuation so that the annual revenue from all sub-districts would exceed $27 million. These proposed boundary changes and tax increases are not involved in this case.

landowners in the annexed part of the district paid the least toward MSD's stormwater services, landowners in the original district paid somewhat more, and landowners in sub-districts paid the most.

In 2007, MSD proposed to remedy these shortcomings. The proposal sets forth MSD's goals and objectives:

> It is the District's objective to implement a stormwater funding methodology by which its stormwater customers provide sufficient revenues to meet the cash requirements to support a basic level of stormwater service. The basic level of stormwater revenue requirements are composed of operation and maintenance expenses ...; capital expenditures, and the build-up of an operation reserve.

The "funding methodology" chosen by MSD to replace the existing stormwater revenue scheme was a "stormwater user charge." Landowners would be required to pay this new charge just as they paid the property taxes it would replace. But unlike the *ad valorem* taxes, which were based on the assessed value of the property, the new stormwater user charge would be based on the square footage of impervious area (e.g., roofs, patios, parking lots, streets, sidewalks, etc.) on each owner's property. When fully implemented, MSD estimated that this new charge would generate annual revenues in excess of $57 million (exclusive of sub-district revenues), which would be more than four times as much as MSD's 2007 stormwater tax revenues.

MSD's proposal explained how it arrived at the rate it would use to calculate each landowner's stormwater user charge. It first estimated the annual revenue needed to ensure availability of adequate stormwater services (i.e., the "required receipts"). Then, it estimated the total square footage of impervious area (divided by 100) throughout the district (i.e., the "available base"). Finally, MSD divided the "required receipts" by the "available base" to arrive at a rate of $2.29 per 100 square feet of impervious area. MSD ultimately divided this rate by 12 to charge the landowners monthly rather than annually.

Some landowners would not have to pay this new stormwater user charge, however, and others would have to pay only part of it. Owners of unimproved land would pay nothing because such properties, by definition, have no impervious areas. Even if a property has impervious area, the owner can receive a credit toward the stormwater user charge if: (a) the property produces no runoff; (b) the property's runoff flows into a major river without passing through MSD's stormwater drainage system; or (c) the property's runoff is captured by a levee district or other wastewater system not owned by MSD. This credit cannot exceed fifty percent, however, because MSD insisted that the owners of such properties must pay at least half of the charge as their share of the cost of MSD's oversight functions of planning, permitting, and public education.[5]

Following public hearings and other proceedings, MSD's rate commission[6] rec-

---

5. An additional exemption was created during this litigation with the enactment of section 204.700, RSMo Supp.2009. The statute exempts residential landowners from having to pay the stormwater user charge if MSD "does not directly provide sanitary sewer services to such property and if the storm water runoff from such person's property does not flow, or is not otherwise conveyed, to a sewer main-

tained by such district." Neither party argues that this statute has any bearing on the application of section 22(a) in this case.

6. MSD's rate commission was created by an amendment to the Plan approved by district voters in 2000. The rate commission cannot set or alter sewer or stormwater rates, but it can recommend that MSD do so. Under the

ommended that MSD implement this proposal. In December 2007, MSD adopted ordinances to eliminate its existing stormwater taxes and implement the stormwater user charge on March 1, 2008. Rather than hit landowners with the new charge all at once, however, MSD chose to phase the charge in over several years. As a result, MSD initially charged an annual rate of $1.44 (or $0.12 per month) for each 100 square feet of impervious area and planned to increase this rate each year so that, by 2014, landowners would pay the full $2.29 rate (or $0.19 per month). MSD implemented the 2009 increase, but abandoned further increases as this litigation proceeded. In July 2010, MSD ceased collecting the stormwater user charge altogether when the trial court declared that MSD had violated section 22(a) by implementing the charge without voter approval.

### ANALYSIS

■ This Court must affirm the trial court's judgment "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). In reviewing the sufficiency of the evidence, the Court is mindful that the trial court may "believe or disbelieve all, part or none of the testimony of any witness ... and an appellate court will accept as true the evidence and inferences from the evidence that are favorable to the trial court's decree and disregard all contrary evidence." *Sch. Dist. of Kansas City v. State*, 317 S.W.3d 599, 604 (Mo. banc 2010).

The parties suggest that this Court is bound by the trial court's application of the *Keller* criteria to the facts in this case. The Court disagrees. Deference is paid to the trial court's factual determinations, but this Court reviews *de novo* both the trial court's legal conclusions and its application of law to the facts. *Id. See also, Murphy*, 536 S.W.2d at 32. Application of the *Keller* criteria (and other relevant considerations) are not facts to be determined solely by the factfinder and deferred to on appeal. Instead, such criteria are a means of evaluating those facts and are intended only to shed what light they can on the application of section 22(a), i.e., a question of law.

### I. The Hancock Amendment

In 1980, Missouri voters approved article X, sections 16–24 of the Missouri Constitution, collectively referred to then and thereafter as the Hancock Amendment. In construing these provisions, this Court has noted that the "Hancock Amendment aspires to erect a comprehensive, constitutionally-rooted shield ... to protect taxpayers from government's ability to increase the tax burden above that borne by the taxpayers on November 4, 1980." *Fort Zumwalt School Dist. v. State*, 896 S.W.2d 918, 921 (Mo. banc 1995) (quotations and citations omitted). Such characterizations of the Hancock Amendment's overarching purpose can provide useful context but, when determining the effect of a particular provision, the text of the constitution must speak for itself.

The principle applicable to this case is found in the very first sentence of the Hancock Amendment:

*Property taxes and other local taxes ... may not be increased* above the

---

Plan, MSD is not bound by the rate commission's recommendations if (among other grounds) MSD believes a recommendation would substantially impair MSD's ability to

provide adequate stormwater services and "public health or institutional safety may be jeopardized."

limitations specified herein *without direct voter approval* .... Implementation of this section is specified in sections 17 through 24, inclusive, of this article.

Mo. Const. art. X, § 16 (emphasis added). The implementation of this principle is specified in section 22(a), which provides:

Counties and other political subdivisions are hereby *prohibited from levying* any tax, license or fees ... *or from increasing the current* levy of an existing tax, license or fees ... without the approval of the required majority of the qualified voters of that county or other political subdivision voting thereon.

Mo. Const. art. X, § 22(a) (emphasis added).

### II. The Keller Decision

*Keller* holds that the phrase "tax, license or fees" in section 22(a) was not intended to encompass every possible source of revenue. *Keller*, 820 S.W.2d at 304–05. Instead, the requirement of voter approval applies only to the levying of new or increased "taxes," and the words "license or fees" were added only to indicate "an intent to prevent political subdivisions from circumventing the Hancock Amendment by labeling a tax increase as a license or fee." *Id.* at 305. Therefore, "what is prohibited are fee increases that are taxes in everything but name .... [and what] is allowed are fee increases which are 'general and special revenues' but not a 'tax.'" *Id.* at 303.

The issue in *Keller* was whether section 22(a) applied to an ambulance district's decision to increase the price a patient must pay to use one of the district's ambulances. The Court held that section 22(a) did not apply because the "charges were for actual services rendered, rather than a subscriber charge of all consumers in the service area." *Id.* at 302, 305. The key distinction in *Keller*, therefore, was between charges that an individual recipient pays for "actual services rendered" and the district's "property tax revenue [that] *assures minimal ambulance service.*" *Id.* at 304 n. 7 (emphasis added).

To illustrate this distinction, assume that a political subdivision imposes a charge on property owners to build and operate a swimming pool. If the political subdivision also decides to charge an admission fee to those who actually use this pool, no voter approval is required under section 22(a) because that charge is a genuine user fee, imposed only when a specific service (i.e., access to the pool) actually is rendered to a particular recipient in an individualized transaction. The first charge is not a user fee, however, because it is not charged in exchange for an individual's use of that service. Instead, it is charged to ensure the *availability* of that service for the entire community. The political subdivision was levying a tax when it imposed the first charge, therefore, and prior voter approval is required under section 22(a).

This key distinction on which the holding in *Keller* is based results from the Hancock Amendment's use of the word "levy." *Id.* at 303. Section 22(a) does not prohibit new or increased taxes. Instead, it prohibits political subdivisions from *levying* new or increased taxes. Because section 22(a) focuses on the nature of the political subdivision's action, *Keller* holds that section 22(a) was not intended to apply to actions that cannot fairly be characterized as a levy.

In ordinary usage, a tax is levied, but a fee is charged. *See* Webster's Third New International Dictionary 1301 (Unabr. ed.1961); *see also* Black's Law Dictionary 907 (6th ed.1990). Reading "levy" in this ordinary sense—as a term related to the power of government to impose a tax—it is clear that a "fee" can

only be levied if the "fee" is actually a tax.

*Id.*

■ The definition of "levy" referred to, but not quoted, in this passage from *Keller* is as follows: "*to impose* or collect (as a tax or tribute) *by legal process or by authority.*" Webster's Third New International Dictionary 1301 (Unabr. ed.1961) (emphasis added). When used in this sense, a levy "is the formal and official action of a legislative body invested with the power of taxation ... whereby it determines and declares that a tax of a certain amount, or of a certain percentage on value, shall be imposed on persons and property subject thereto." *State ex rel. Indus. Servs. Contractors, Inc. v. Cnty. Comm'n of Johnson Cnty.*, 918 S.W.2d 252, 256 (Mo. banc 1996) (quotation marks omitted) (quoting 84 C.J.S. Taxation § 349 (1954)). In other words, the verbs "levy" and "levying" are used in section 22(a) to refer to actions that create an obligation to pay that is not contingent upon each payer's actual use of the political subdivision's service.[7]

Applying this definition, *Keller* holds that the ambulance district was not levying a tax when it decided to increase the price it would charge a patient for using its services. *Keller*, 820 S.W.2d at 305. The act of setting that price was not a levy because the obligation to pay arises only if and when a particular patient actually uses an ambulance. Again, assume there is a drive-thru across the street from the swimming pool in the prior example. If the owner of the drive-thru decides to raise the price of a hamburger, the owner is not "levying" a price increase—*even if* the owner is a political subdivision—be-

cause the decision to increase that price has no practical or legal consequences unless and until a customer drives through and buys a hamburger.

## III. The Keller *Criteria*

■ The holding and reasoning of *Keller* have been overshadowed to some degree by the list of five criteria offered there to be "helpful in examining charges denominated as something other than a tax." *Keller*, 820 S.W.2d at 304 n. 10. In supplying these criteria, however, *Keller* warns: "No specific criterion is independently controlling; but, rather, the criteria together determine *whether the charge is closer to being a 'true' user fee* or a tax denominated as a fee." *Id.* (emphasis added). From the outset, therefore, the Court sought to ensure that the *Keller* criteria were viewed not as constitutional litmus tests to be applied with scientific rigor, but merely as relevant considerations that can point toward a proper classification.

In *Arbor Inv. Co., LLC v. City of Hermann*, 341 S.W.3d 673 (Mo. banc 2011), this Court again emphasized that the *Keller* criteria are to be used only as reliable indicators, not constitutional divining rods.

> [C]onsideration of the *Keller* factors is a necessary step, but the purpose of their use is not because an arithmetic score will be determined that decides whether the particular charges in question pass or fail but rather is to assist the courts in determining the ultimate issue of whether the charge is a user fee or a disguised tax.

*Id.* at 682.

■ Finally, and perhaps most importantly, the *Keller* criteria were not cut

---

7. This meaning of the word "levy" should not be confused with the meaning "sometimes used, in the administrative sense, as referring to the mere ministerial or executive acts of ascertaining and entering the taxes on the tax book and collecting them." *State ex Inf. Dalton v. Metropolitan St. Louis Sewer District,* 365 Mo. 1, 275 S.W.2d 225, 233 (1955).

from whole cloth. Instead, *Keller* offers these criteria solely to aid courts in applying the Court's long-standing, "traditional" test for distinguishing fees and taxes: "Fees or charges prescribed by law to be paid by certain individuals to public officers for services rendered in connection with a specific purpose ordinarily are not taxes." *Keller*, 820 S.W.2d at 303–04 (quotation marks omitted, citing *Leggett v. Missouri State Life Ins. Co.*, 342 S.W.2d 833, 875 (Mo. banc 1960)). The *Keller* criteria, therefore, were intended only to adapt the *Leggett* test to a new constitutional context, not replace it completely.

Many courts—including the trial court in this case—have expressed frustration with the *Keller* criteria on the ground that they provide little insight and are subject to manipulation. The problem may lie with how the criteria have been applied. Before meaningful guidance can be gleaned from any of the *Keller* criteria, the *Leggett* test makes it clear that the court first must have a clear and complete understanding of the *service* that the political subdivision claims to provide, including the *users* of this service and the *transactions* in which that service supposedly is rendered in exchange for the user fee. *See Leggett*, 342 S.W.2d at 875 (fees are not taxes if they are "paid *by* certain individuals *to* public officers *for* services rendered") (emphasis added).

Despite the critical importance of these determinations, no express inquiry into the nature of the political subdivision's service occurs until the fourth *Keller* criterion. Even then, *Keller* fails to emphasize the scope or importance of this service analysis, probably because *Keller* assumes this is clear from the *Leggett* test. In hindsight, however, the *Keller* criteria eclipsed the role of the *Leggett* rule so thoroughly that this connection rarely is made. As a result, the cause of judicial frustration with

the *Keller* criteria may lie more with the *order* of those criteria than with their *substance*. To demonstrate this point (and avoid a further dose of judicial frustration), this Court begins its analysis with the fourth *Keller* criterion.

### A. Keller *Criterion No. 4:*

### *What service does MSP provide in exchange for the fee?*

The fourth *Keller* criterion asks whether the political subdivision is providing a service in exchange for the disputed charge. *Keller*, 820 S.W.2d at 304 n. 10. MSD does not contend that the stormwater charge is a fee for using MSD's drainage system by discharging stormwater into it during a storm or a fee for using MSD's oversight functions by obtaining a single inspection, permit, or educational program. MSD cannot make that argument because the facts do not support it. MSD admits that a Ratepayer pays the same stormwater charge every month regardless of the amount of rainfall or the amount of stormwater it discharges into MSD's drainage system, and that Ratepayers still must pay fifty percent of the charge even if they never use the drainage system. Meanwhile, MSD admits there are thousands of landowners who pay no part of the stormwater charge even though they discharge stormwater into MSD's drainage system every time it rains.

MSD concedes that it cannot charge a user fee for each landowner's use of the stormwater drainage system because MSD has no way of knowing how much stormwater any particular landowner is discharging into that system at any particular time. MSD does not even claim that the stormwater charge is based on an estimate of such usage, using the amount of impervious area on a property as a proxy for the amount of actual runoff from that property. MSD admits that the amount of im-

pervious area on a particular property has nothing to do with the total amount of stormwater runoff from that property into MSD's drainage system. Accordingly, the stormwater charge is not—and MSD does not claim that it is—a user fee charged for a landowner's actual use of MSD's drainage system. By the same token, the stormwater charge is not a user fee charged for the use of MSD's oversight services such as planning, permitting, or education. MSD renders these services as requested or needed, regardless of whether the user pays the stormwater charge for owning land with impervious area.[8]

Even though MSD concedes that this charge is not a user fee based on the actual use of MSD's stormwater drainage system or oversight functions, MSD insists that the charge is a proper user fee because those are not the relevant services. Instead, MSD insists that the relevant service for purposes of evaluating whether the stormwater charge is a user fee is MSD's ensuring the "continuous and ongoing" *availability* of a stormwater drainage system regardless of the weather, and the "continuous and ongoing" *availability* of its oversight functions regardless of when they are requested or needed. MSD makes no effort to identify the individual users of these "availability" services, however, or the transactions in which those services are rendered in exchange for a user fee. Instead, MSD argues that actual usage should not matter.

MSD explains there was no need for stormwater services when the district was in its natural state because stormwater ran wherever gravity took it. When development replaced natural surfaces with imper-

vious areas (e.g., roofs, sidewalks, streets, parking lots, etc.), however, these impervious areas generated more and faster runoff than the natural surfaces they replaced. MSD insists that this additional runoff creates the need for the stormwater services it provides. Because the need for stormwater services is created by the additional runoff that impervious areas produce, MSD contends that the total amount of impervious area must equal the total need for such services and the amount of impervious area on each owner's property must represent that owner's individual contribution to the overall need for those services. Accordingly, MSD insists that this individual contribution to the overall need for MSD's service is the fairest basis for determining each owner's share of the total costs of those services.

These arguments explain why MSD believes it is fair for owners of property with impervious area to pay the stormwater user charge while owners of property with no impervious area do not. But MSD's arguments have nothing to do with whether the stormwater charge is a user fee because they say nothing about who uses MSD's stormwater services. In other words, MSD contends that: (a) because the owners of property with impervious area are responsible, collectively, for creating all of the need for stormwater services, those owners, collectively, must pay for them; and (b) because these owners pay for all of MSD's stormwater services, they must be the only users of those services. The Court rejects this tautology.

The Court accepts MSD's characterization of the stormwater services it provides. The relevant service for purposes of ana-

---

8. This is not to say that MSD cannot charge user fees for some of its oversight services. It can, and does. In 2007, MSD collected more than $2 million in plan review and submittal fees, waste hauler permits, inspection fees, etc. The stormwater user charge is not such a fee, however, because it is not charged in exchange for rendering one of these services to an individual user.

lyzing the stormwater user charge in this case is not that MSD provides drainage or oversight to individual users at particular times. Instead, the relevant service is MSD's ensuring the "continuous and ongoing" availability of its drainage system and oversight functions, regardless of whether or when they are needed. But the Court rejects MSD's argument that it provides these generalized "availability" services only to the Ratepayers and no one else. Instead, the Court holds that the user of MSD's "availability" services is the district as a whole. Because such "availability" services cannot be rendered to particular users in individualized transactions does not mean that MSD can charge a user fee for those services on some basis other than use. It cannot. Where there are no individual users and no readily identifiable transactions in which the political subdivision renders the relevant service in exchange for a fee, the charge cannot be a valid user fee.

In *Keller*, the Court evaluated an ambulance district's decision to increase the price charged in exchange for rendering a specific ambulance service to an individual user in a readily identifiable transaction. The Court contrasted that fee with the charges that the ambulance district imposed on landowners to ensure the *availability* of such services without regard to usage, i.e., taxes. This case presents the reverse comparison. MSD imposed the stormwater user charge on landowners to ensure that its stormwater services would be available for the entire district when needed. It is immaterial that MSD limited this charge only to those it believes are responsible for creating the need for these services rather than all landowners as in *Keller*. What matters is that MSD did not impose the charge in exchange for an individual's actual use of those services.[9]

## B. Keller *Criterion No. 2:*

### Who pays—owners or users ?

*Keller*'s second criterion distinguishes between charges that are paid by "all or almost all of the residents of the political subdivision" and charges that are paid by "those who *actually use* the good or service for which the fee is charged." *Keller*, 820 S.W.2d at 304 n. 10 (emphasis added). The parties devote much of their arguments to debating what constitutes "all or most" of the relevant population, but this debate misses the point of this criterion. The question is not what percentage of the population is charged, but why some are charged and others are not.

As *Keller* makes clear, if the political subdivision ties its charge to the use of the political subdivision's service, and if it charges this fee to all who use its service, it is likely that the political subdivision is setting the price for rendering its services to individual users and voter approval under section 22(a) is not required. But if the political subdivision ties the fee to residency or ownership instead of use, the charge is not a user fee and prior voter approval is required.

---

**9.** Nothing prevents a political subdivision from levying a tax to ensure the availability of its service and charging a user fee for rendering that service to an individual. The district in *Keller* did so and the Court upheld the user fee while noting that the ambulance district also levied taxes to ensure the availability of its ambulance service. In the pool example above, an admission charge is allowed even though the availability of the pool is supported by taxes. MSD, too, can collect such user fees—and does. *See* note 8, *supra*. MSD claims it cannot charge a user fee for its drainage system because it cannot track which owner is using it or to what extent. That may be. In this case, however, MSD does not even claim that the charge was imposed on this basis.

The Court holds above that MSD's service is ensuring the "continuous and ongoing" availability of its stormwater drainage system and oversight functions. But MSD does not—and cannot—tie the obligation to pay the stormwater user charge to an individual landowner's use of MSD's "availability" service because it renders that service to the district as a whole, not to individual landowners. Instead, MSD expressly ties the obligation to pay the stormwater charge to the ownership of real property. Accordingly, this criterion weighs strongly against the conclusion that MSD was imposing a user fee when it imposed the stormwater user charge.

As above, MSD seeks to avoid this result by arguing that "contribution to the need" for a service is the same as the "use" of that service. The Court has rejected this argument but, in this context, its flaws are even clearer. By tying the obligation to pay the stormwater charge to ownership of land, MSD knew it would recover the anticipated revenue over the course of a year regardless of whether or to what extent any individual used its stormwater services. This has all of the essential characteristics of a levy, i.e., an act that creates an obligation to pay that is not contingent upon any later use of the political subdivision's service.

This is why the second *Keller* criterion focuses on the source of the obligation to pay the disputed charge. If the political subdivision's action has no legal or practical effect until the payer uses the relevant service (e.g., rides in the ambulance or buys the hamburger), it is likely that the political subdivision was imposing a user fee and not levying a tax. If the obligation to pay is tied to ownership, however, the payer's actions neither trigger nor avoid the obligation, and the political subdivision's action meets the *Keller* definition of such a levy.

MSD claims that the obligation to pay the stormwater user charge is not tied solely to ownership of land because the charge varies based upon the amount of impervious area on that land. This argument is directed at the amount of the charge, not at the source of the obligation to pay. For example, if MSD had chosen to vary the amount of its stormwater user charge based on the assessed value of the property rather than the amount of impervious area, the flaw in MSD's argument would be so obvious that further analysis would not be needed. That MSD chose a different attribute of the property—and one equally out of the payer's control—on which to vary its stormwater charge does not alter the fact that MSD tied that charge to ownership, not use.

■ Under this criterion, what matters is not how the amount of the charge is calculated but whether the charge is triggered by use of the political subdivision's service or some factor other than use, including residency or land ownership. Once MSD decided to impose the stormwater user charge as it did, there was nothing that a landowner needed to do (or could refrain from doing) that could affect whether that obligation arose.[10] As a re-

---

10. To be clear, whether the payer's receipt of the service is voluntary or involuntary is not determinative. A political subdivision can charge a valid user fee for rendering a service to a particular user in an individual transaction, *even though* the recipient's use of that service is not voluntary. For example, a political subdivision can provide trash removal services in exchange for a fee. Leaving aside the other legal issues this may create, the mere fact that a resident is required to use the political subdivision's trash service does not change the nature of that service or the fact that the resident is the user of it. Therefore, what matters is not whether payment of the stormwater charge is voluntary but whether the obligation to pay the charge is triggered

sult, the charge is not tied to any use of MSD's service and, in fact, does not even purport to be. Accordingly, this criterion strongly suggests that MSD levied this charge without the prior voter approval required by section 22(a).

## C. Keller *Criterion No. 1:*

### *When is it paid—regularly or after use ?*

Like the preceding criterion, this criterion also focuses on the obligation to pay the disputed charge. But, rather than analyze the trigger for that obligation, this criterion analyzes when the payments occur. When the charge is "paid *only on or after* provision of a good or service to the individual paying," *Keller* notes that it is likely that the political subdivision was setting a user fee and not levying a tax. *Keller*, 820 S.W.2d at 304 n. 10 (emphasis added). When the charge is paid periodically, however, and regardless of when (or even if) the payer actually uses the relevant service, this criterion indicates that the political subdivision has levied a tax.

Because MSD's service is ensuring the "continuous and ongoing" availability of its drainage system regardless of whether or how much it rains, MSD argues that each Ratepayer's use of that service must be "continuous and ongoing" as well. As noted above, however, the only user of MSD's "availability" service (if the concept of use applies at all) is the district as a whole, not an individual landowner.

MSD also argues that a Ratepayer necessarily pays "only on or after" using MSD's services because no payments were due until April 1, 2008, one month after the stormwater user charge was implemented. Under this criterion, however, the question is not simply regularity or whether the payments are in advance or in arrears.

The focus of this criterion is on whether the payment is made "only on or after" the payer uses the political subdivision's service. Here, because individual use of MSD's "availability" services is not possible, payments of the stormwater charge cannot be made "only on or after" the individual payer uses those services.

It does not matter why MSD deferred initial payments until a month after it implemented the stormwater charge. What matters is that both the due date and the implementation date were set without reference to external events or objective criteria. As a result, the stormwater charge is precisely the sort of periodic charge unrelated to the payer's actual use of the relevant service that the first *Keller* criterion seeks to identify.

In addition, MSD's claim that the stormwater charge is a monthly fee collected after services are rendered is contradicted by the facts. MSD's 2007 proposal demonstrates that MSD calculated the stormwater user charge on an *annual* basis. MSD divided the total amount of money that it wanted to generate each year by the available base throughout the district. Whether the available base is total amount of impervious area or total assessed valuation, the process MSD used is the same process every taxing authority uses when levying a tax. *Lane v. Lensmeyer*, 158 S.W.3d 218, 228 n. 14 (Mo. banc 2005). Here, this process resulted in a rate for the stormwater charge of $2.29 per 100 square feet of impervious area. MSD labeled this rate in its 2007 proposal as follows: "Projected stormwater service charge per 100 square feet impervious area (*annualized rate—billable monthly* )" [Emphasis added.] Therefore, MSD's decision to collect this charge monthly rather than annually was a matter

by the use of MSD's stormwater services rath-

er than the payer's ownership of property.

of its own convenience, not constitutional significance. Though there is nothing illicit or illegal about MSD's decision to collect the stormwater charge monthly, MSD cannot use that decision as support for its argument that Ratepayers' payments are made "only on or after" each Ratepayer's use of MSD's "availability" services.

Finally, MSD claims that it converted its stormwater revenue scheme from the previous tax-based approach to an approach based on the stormwater user charge at 12:00:01 a.m., March 1, 2008. Therefore, MSD argues that all payments made after this conversion were made "only on or after" the payer used MSD's stormwater services. The facts suggest, however, that MSD's stormwater revenue scheme was the *only* thing that changed on that date. Stormwater continued to flow downhill from wherever it landed, and no more stormwater flowed through MSD's drainage system after March 1, 2008, than before. MSD did not change how it provided its services or, more importantly, who the users of those services were. At best, MSD claims that it was able to expand its services because of the increased revenue. But this proves too much. Any improved or expanded services were provided wherever they were needed. They were not provided solely to those who paid the stormwater charge any more than they were provided in exchange for that fee.[11]

The Court holds that there are no individual users of MSD's service of ensuring the "ongoing and continuous" availability of its drainage system and oversight functions. Such a service is rendered to the entire district. With no individual users and no way to tell when or to whom such "availability" services actually are rendered, this criterion weighs heavily in favor of the conclusion that MSD was not imposing the stormwater charge as a user fee. Accordingly, MSD violated section 22(a) when it implemented this charge without voter approval.

## D. Keller *Criterion No. 3:*
### *How much to pay—fixed amount or based on usage ?*

The third *Keller* criterion looks at how the amount of the charge is calculated but, like the preceding two criteria, this criterion focuses on the relationship between the disputed charge and the payer's use of the service that supposedly is being rendering in exchange for that fee. The more the amount of the charge is "dependent on the level of the goods or services provided to the fee payer" (i.e., the extent of the user's usage), the more likely it is that the political subdivision was setting a user fee rather than levying a tax. If the individual's use of the relevant service has little or no effect on the amount of the charge, however, it is likely that the political subdivision has levied a tax without prior voter approval. *Keller*, 820 S.W.2d at 304 n. 10.

MSD suggests that the criterion should be worded: "If a user charge is *individualized and variable,* rather than averaged and flat, and if the *measure of the service*

---

11. MSD's evidence and briefs are replete with similar statements that reflect a common-sense understanding of these circumstances and undercut MSD's efforts to contort those circumstances to satisfy the *Keller* criteria. MSD provides the best stormwater services it can, and it provides them wherever they are needed most and will do the greatest good for the entire district. It does not render interchangeable units of service to individual users in exchange for a fee, and the stormwater charge was not intended to change how or to whom MSD rendered those services. Instead, the charge was intended to increase revenues so that MSD could continue providing adequate services to the district. Only in the singular light of *Keller* would anyone suggest that this charge was imposed as a fee to be paid by particular users in exchange for a set measure of MSD's stormwater services.

*relates to the level of the services,* then the user charge passes muster under [*Keller*] Factor 3." [Emphasis added.] The Court rejects this alternative formulation. Property taxes imposed on an *ad valorem* basis are every bit as "individualized and variable" as MSD's stormwater user charge. The only difference is the variable. As a result, the first part of MSD's restatement adds nothing useful.

The remainder of MSD's alternative formulation of this criterion reflects MSD's effort to substitute the concept of "contributing to the need" for a service for the concept of the "use" of that service. First, MSD uses the phrases "measure of service" to refer to an owner's individual contribution to the overall need for stormwater services, and MSD measures this contribution by the amount of impervious area on that owner's property. Second, MSD argues that voter approval should not be required as long as there is some relationship between an individual's contribution to the overall need for a service (i.e., the "measure of the service") and that individual's actual use of MSD's stormwater services (i.e., the "level of the services"). The Court rejects such an attenuated standard.

To be a user fee beyond the scope of section 22(a)'s voter approval requirement, the charge must be paid by all of the users of the relevant service based on each payer's actual use of that service. Here, MSD concedes the charge is based on each Ratepayer's individual contribution to the overall need for stormwater services. That contribution is not, as MSD suggests, "related" to each Ratepayer's use of that service. Because the relevant service is MSD's ensuring the "continuous and ongoing" availability of its stormwater drainage system and oversight functions for the entire district, there are no individual users of MSD's service. Accordingly, this criterion—like the others—weighs in favor of the Court's conclusion that MSD violated section 22(a) when it implemented the stormwater user charge without prior voter approval.

MSD claims that its stormwater charge is the same as the rates charged by other utilities and, under *Arbor,* must be deemed to be a valid user fee. MSD argues that utilities use rates as a method of allocating costs among their customers in a fair and reasonable manner, and that this is what MSD did when it implemented the stormwater charge. The flaw in this argument is the same flaw that runs throughout all of MSD's arguments. MSD accurately describes how utilities *set* their rates, but utilities charge those rates only for actual *use* of their services.[12] MSD charges its stormwater fee based on each landowner's contribution to the overall need for MSD's stormwater services, not that owner's actual use of those services. The two are different. Because there can be no indi-

---

12. The Court is aware that MSD's 1993 sewer charges—also imposed without prior voter approval—were determined not to be a violation of section 22(a) because those sewer charges were a valid "user fee." *Missouri Growth Ass'n v. Metro. St. Louis Sewer Dist.,* 941 S.W.2d 615, 624 (Mo.App.1997). In reaching that conclusion, *Missouri Growth* distinguished *Beatty II,* which held that MSD's sewer charges were taxes and not user fees, on the ground that MSD had made "significant changes" to its sewer charges after *Beatty II* was decided. Specifically, MSD be-gan charging (at least in part) on the basis of each customer's actual sewer usage, which MSD estimated on the basis of the customer's actual water usage. *Id.* The question of whether using water usage as a proxy for sewer usage is adequate to change MSD's sewer charges from taxes (as held in *Beatty II* ) to user fees (as held in *Missouri Growth* ) is not before this Court. Here, MSD does not claim that the amount of impervious area on a given property is a proxy for a landowner's use of MSD's stormwater drainage system.

vidual users of MSD's "availability" services, this difference is material and precludes any possibility that the stormwater charge is a valid user fee.

### E. Keller *Criterion No. 5:*

### *Is the service historically and exclusively governmental ?*

The fifth *Keller* criterion focuses on whether the services being provided have "historically and exclusively been provided by the government." *Keller*, 820 S.W.2d at 304 n. 10. This criterion is based on the assumption that historically governmental services are more likely to be funded by levying taxes but, when a political subdivision enters into the private-sector market, it is more likely to charge a price for its services just as its private competitors do.

Early in MSD's existence, this Court affirmed MSD's broad governmental powers: "Providing for [stormwater] drainage and sewerage is a *governmental function* and an exercise of the police power of the state." *Dalton*, 275 S.W.2d at 230 (emphasis added). This Court later rejected the notion that MSD should be treated as a private-market participant: "MSD, which operates under the police power of the state in the interest of the public health, safety and welfare, is in effect an arm of the state *exercising exclusively governmental* functions. *It has no private, proprietary functions to perform.*" *Page v. Metropolitan Sewer Dist.*, 377 S.W.2d 348 (Mo.1964) (emphasis added, citations omitted).

MSD attempts to counter its unique history by arguing that individual landowners, subdivision developers, and other private actors also ensure (or have ensured) the availability of stormwater drainage systems.[13] MSD misperceives the fifth criterion. The question is not whether non-governmental entities ensure (or have ensured) the availability of the type of stormwater drainage system MSD maintains. The question is whether non-governmental entities do (or did) so in exchange for a fee.

There is no evidence that any private entity provides (or ever has provided) availability of a stormwater drainage system for individual landowners for a fee, as MSD claims to do. The only marginally analogous providers are levee districts and landowners associations that support their ability to "ensure" the availability of stormwater drainage by levying taxes or assessments. MSD's contention that some landowners maintain availability of stormwater drainage facilities on their own property falls short of the mark. Maintaining stormwater controls on one's own property is no more "ensuring" the availability of such services than stringing an extension cord between a lamp and a wall socket is "ensuring" the availability of electricity. If a private developer constructing a stormwater drainage system for a new subdivision can be characterized as "ensuring" stormwater services, there is no evidence that developers do so in exchange for a fee paid by each individual landowner. Instead, the costs of such improve-

---

**13.** In arguing this fifth criterion, MSD scarcely mentions the oversight functions (e.g., planning, permitting, and public education) that it argues elsewhere are so significant that they justify requiring a Ratepayer to pay at least half of the stormwater user charge even if that Ratepayer never discharges a drop of stormwater into MSD's drainage system.

Nor is there much for MSD to gain by emphasizing MSD's oversight functions under this criterion, given that there does not appear to have been any evidence that private entities do provide—or ever have provided—such oversight functions to individual landowners for a fee or otherwise.

ments are more likely to be reflected in the prices charged for the subdivision lots.

Accordingly, the fifth *Keller* criterion suggests that MSD was levying a tax—not merely setting a price—when it imposed the stormwater user charge without prior voter approval.

## F. Additional Characteristics

The material inquiry is—and always must remain—whether the political subdivision has levied a new or increased tax without prior approval of its voters. Missouri voters did not approve the five *Keller* criteria when they approved the Hancock Amendment, nor does *Keller* hold that Missouri voters intended that no voter approval would be required if a new or increased tax is repackaged to "pass muster" under some or all of those criteria. Instead, this Court emphasized both in *Arbor* and in *Keller* that those criteria were offered only for whatever insight they may provide when applying section 22(a) to a particular charge. They are not—and were not intended to be—constitutional talismans that can be used to ward off the application of section 22(a).

 *Arbor* also confirms that the *Keller* criteria are not the only indicia courts may consider when determining whether a political subdivision has levied a tax without voter approval. *Arbor*, 341 S.W.3d at 683. Courts may—and should—review all relevant considerations so that the decisions regarding the application of section 22(a) are as well-informed as possible. Accordingly, this Court has weighed the following facts and circumstances offered by

the parties in deciding whether voter approval under section 22(a) was required before MSD could impose the stormwater user charge.

### 1. MSD's Lien for Nonpayment

In *Beatty v. Metropolitan Sewer District*, 867 S.W.2d 217 (Mo. banc 1993) (*Beatty II*), MSD claimed that its increased sewer charges were valid user fees under *Keller* after the voters rejected those increases at the polls. *Id.* at 221 ("MSD read *Keller* in light of its financial needs and increased its charges . . . without voter approval"). This Court concluded that MSD violated section 22(a) by implementing the increased charges despite the voters' rejection based, in part, on the fact that MSD's ordinances gave it a lien on the real property of any landowner who failed to pay those charges. *Id.*[14] In *St. Louis Investment Properties*, 873 S.W.2d at 307, MSD's authority to force the sale of real property to ensure payment of its charges was held to be inherent in its express authority to impose those charges under the Plan. Here, as in *Beatty II*, MSD enacted an ordinance giving it a lien on the property of any Ratepayer who fails to pay the stormwater user charge. This ordinance expressly provides that MSD's lien will have the "same priority as taxes levied for state and county purposes."

Absent an agreement by the debtor, only the government (and those creditors it elects to favor with this remedy by statute) enjoy the benefits of a lien arising solely from the nonpayment of an obli-

---

14. *Beatty II* also holds that, because "true" user fees are seldom difficult to spot, section 22(a) applies to all actions by political subdivisions that impose a new or increased charge unless circumstances clearly refute that the action was a levy. MSD argues that this aspect of *Beatty II* fails to presume constitutionality and should be overruled. This is

incorrect. *Beatty II* does not shift the burden of proof. It merely holds that the burden is met whenever a political subdivision imposes a new or increased charge without voter approval and the classification of the charge as a user fee is not compelled clearly and unmistakably by the *Keller* criteria and other relevant considerations.

gation. This is why, in *Beatty II*, the Court found that MSD's decision to give itself a lien for nonpayment of its sewer charges suggested that it had levied those charges as taxes. By the same token, *Arbor* holds that the absence of any such lien for nonpayment of the utility charges at issue there suggested that the political subdivision was imposing user fees and not levying taxes. MSD's stormwater charge more closely resembles the facts in *Beatty II* than those in *Arbor*. The fact that MSD has given itself a lien as a remedy for nonpayment of the stormwater user charge suggests that MSD was levying a tax when it implemented that charge and not simply setting prices for future sales of its services.

### 2. MSD's Other Remedies

As noted above, the political subdivision in *Arbor* did not give itself a lien in the event of nonpayment of the utility rates at issue there. The Court not only cited the absence of such a remedy in concluding that the political subdivision was not levying taxes when it increased those utility rates, the Court also noted that "the result of failure to pay a city utility bill is that the service will be cut off, just as a *private utility terminates service when payment is not made.*" *Arbor*, 341 S.W.3d at 686 (emphasis added).

Here, MSD does not claim the right to shut off a Ratepayer's access to MSD's stormwater drainage system and oversight functions in the event that Ratepayer fails to pay the stormwater user charge.[15] Instead, MSD claims the right to shut off

that Ratepayer's sewer services and water supply. Unlike the remedy cited in *Arbor*, the fact that MSD can use nonpayment of its stormwater user charge as a justification to withhold services having nothing to do with stormwater services—including a justification to withhold water service, which MSD does not even provide—weighs against MSD's contention that it was imposing a user fee when it implemented this charge. Such remedies are more characteristic of the way in which governments collect unpaid taxes than the manner in which private parties collect unpaid prices or user fees.

### 3. Voters' Remedies

 Ratepayers suggest that, because voters do not directly elect the MSD trustees, it is more likely that MSD was levying a tax when it adopted the stormwater user charge. The Court disagrees. MSD's political structure has no bearing on the question of whether section 22(a) requires voter approval before its stormwater user charge can become effective. References in *Keller* and *Arbor* to the voters' opportunities to elect the leaders of those political subdivisions had nothing to do with the application of section 22(a). Instead, those statements were made in response to the taxpayers' complaints regarding the amount of the charges.

Complaints about the amount of a given charge were a side issue in *Keller*, but they became the central issue in *Arbor*. In both cases, this Court held that the amount of the fee has no bearing on the application of section 22(a) and noted that

---

**15.** The reason that MSD does not claim the right to shut off a landowner's access to MSD's stormwater drainage services is that MSD has no *ability* to do so. Few, if any, properties are connected physically to MSD's stormwater drainage system in the way that customers are connected to MSD's sewer system (or to the electrical grid, water main, or gas supply) such that those services can be turned off and on. In addition, because MSD's service is ensuring the availability of its stormwater drainage system and oversight functions if and when they are needed, MSD can no more "shut off" such "availability" services than it can charge a fee for rendering those services to a particular landowner.

taxpayers' remedies for such complaints were political rather than legal. Here, Ratepayers do not complain about the amount of the stormwater user charge. If they had, Ratepayers' political remedies are no more relevant to whether MSD violated section 22(a) by levying the stormwater user charge without voter approval than in *Keller* or *Arbor* simply because those remedies are indirect (i.e., through the elected city and county officials who appoint MSD's trustees) rather than direct.

### G. Conclusion

■ This Court sympathizes with MSD's predicament. The services it believes are required may cost more than district voters are willing to pay. Under the Hancock Amendment, however, that decision belongs to the voters. The Hancock Amendment assumes voters will make such decisions in their collective best interest, and it is not for MSD—or this Court—to ignore that assumption or deny the voters the right to make such decisions for themselves. For the reasons stated above, therefore, the *Keller* criteria and other relevant factors support the trial court's conclusion that MSD levied the stormwater user charge without prior voter approval in violation of section 22(a).

### IV. Refunds

Because the trial court's judgment on the merits is affirmed, this Court must decide what remedies are authorized by the Hancock Amendment. The trial court gave Ratepayers prospective relief in the form of a declaratory judgment that MSD's decision to impose the stormwater user charge without prior voter approval violated section 22(a) and an injunction prohibiting MSD from collecting that charge in the future. The trial court, however, denied Ratepayers' request for an order requiring MSD to refund approxi-

mately $90 million in stormwater user charges collected between April 2008 and the date of the trial court's judgment on the merits.

■ Absent special circumstances not present here, it is well-established that a taxpayer is not entitled to a refund of illegal taxes unless the refund is authorized by law. *Community Fed. Sav. & Loan Ass'n v. Dir. of Revenue*, 752 S.W.2d 794, 797 (Mo. banc 1988). Accordingly, even though MSD levied the stormwater user charge without prior voter approval in violation of section 22(a), Ratepayers are not entitled to a refund of amounts already collected because nothing in section 22(a) or elsewhere in the Hancock Amendment expressly authorizes Missouri courts to order such a remedy.

As noted above, section 16 sets out the Hancock Amendment's overarching prohibition against levying taxes without voter approval and provides that subsequent sections will "implement" that basic prohibition. Section 22(a), discussed above, is one such implementing provision. Section 23 is another. It provides:

> [A]ny taxpayer ... shall have standing to bring suit ... to enforce the provisions of sections 15 through 22, inclusive, of this article and, if the suit is sustained, shall receive from the applicable unit of government his costs, including reasonable attorneys' fees incurred in maintaining such suit.

■ By its plain language, the only monetary relief courts are authorized to give under section 23 is an award of expenses and attorneys' fees. *Fort Zumwalt*, 896 S.W.2d at 923. The principal relief authorized by section 23, therefore, is declaratory and not remedial.

The heading of article X, section 23 of the Missouri Constitution describes the nature of the remedy for a Hancock

Amendment violation. It reads "Taxpayers may bring *actions for interpretations of limitations.*" *Id.* An interpretive remedy, in this context, allows the court to interpret a particular statute in light of [the Hancock Amendment's] constitutional limitations. In other words, section 23 authorizes declaratory relief but does not mention other forms of relief, such as injunction or damages.... The limited nature of the declaratory, or interpretive, remedy does not authorize a court to enter a judgment for damages or injunctive relief.

*Taylor v. State,* 247 S.W.3d 546, 548 (Mo. banc 2008) (emphasis added).

Not only is there no express authority in the Hancock Amendment's remedies provision (i.e., section 23) to order MSD to pay $90 million to Ratepayers and their attorneys, the substantive provisions of the Hancock Amendment at issue in this case (i.e., sections 16 and 22(a)) also do not authorize such a remedy. This lack of express authority in sections 16 and 22(a) is even more significant in light of the express authority under section 18(b) of the Hancock Amendment for the state to pay refunds in the event it violates the provisions of section 18(a). The framers of the Hancock Amendment knew how to authorize this remedy when appropriate and chose to restrict its use only to violations of section 18(a) and not section 22(a).

There are sound reasons for the Hancock Amendment to limit the use of refunds. In light of the Hancock Amendment's overarching purpose to limit taxes (and, as a result of that limitation, to limit spending), unfettered use of refunds as a remedy for any and all violations easily might do more harm than good. The present case is a good illustration. As with most governmental entities, MSD operates on a cash basis and, for all practical purposes, was spending the stormwater user charge as quickly as it collected it. When the trial court declared MSD's imposition of the stormwater charge unconstitutional in July 2010, MSD ceased collecting that charge and returned to its prior stormwater revenue scheme. As a result, MSD lacked the means simply to "refund" the estimated $90 million in stormwater charges previously collected.

Prior to levying the stormwater user charge in March 2008, MSD's stormwater revenues were $19 million less than the costs of its stormwater operations. If this Court ordered MSD to pay $90 million in refunds, its only options would be to cease all operations and divert all revenue to those refunds or impose a new tax that (assuming the voters would approve it) likely would only serve to shift funds inequitably from one cohort of taxpayers to another. Nothing in the Hancock Amendment authorizes—let alone requires—this Court to order such a "musical chairs" approach to taxation.

Accordingly, this Court holds that the Hancock Amendment does not expressly authorize Missouri courts to order a political subdivision to refund taxes collected in violation of section 22(a).[16] To order re-

---

**16.** The trial court reasoned that Ratepayers were not entitled to refunds because they failed to comply with the refund procedures in section 139.031, RSMo Cum.Supp.2012. Both parties addressed the applicability of section 139.031 to claims for refunds under the Hancock Amendment, but the Court declines to decide this question on the ground that it would be a wholly advisory opinion. In certifying the plaintiff class in this case, the trial court excluded all landowners who paid the stormwater user charge under protest as required by section 139.031. Ratepayers do not challenge that ruling and the definition of the certified class is not before this Court. As a result of this definition, therefore, landown-

funds without such express authority is, at best, to "infer or imply that a waiver of sovereign immunity extends to remedies that are not *essential* to enforce the right in question." *Fort Zumwalt*, 896 S.W.2d at 923 (emphasis added). This the Court will not do. .

Ratepayers contend that this holding conflicts with this Court's earlier holdings in *Beatty v. Metropolitan St. Louis Sewer District*, 914 S.W.2d 791 (Mo. banc 1995) (*Beatty . III* ), *Ring v. Metropolitan St. Louis Sewer District*, 969 S.W.2d 716 (Mo. banc 1998), and *City of Hazelwood v. Peterson*, 48 S.W.3d 36 (Mo. banc 2001). The Court disagrees. None of these cases stands for the proposition that the Hancock Amendment, by itself, authorizes Missouri courts to order refunds (or enter money judgments on any other basis) when a political subdivision has levied a charge without voter approval in violation of sections 16 and 22(a). This Court never has addressed this question squarely until this case, and the Court now rejects that proposition.

Ratepayers claim *Beatty III* holds that the Hancock Amendment authorizes refunds when a political subdivision violates section 22(a). This is incorrect. *Beatty III* expressly declined to reach that issue. The taxpayers who challenged MSD's increased sewer charges in the *Beatty* saga did not seek refunds as a remedy for MSD's violation of section 22(a). Instead, they "filed a lawsuit seeking declaratory relief and an injunction prior to payment of the increased sewer rates," which this Court noted was an "appropriate method to enforce the Hancock amendment."

*Beatty III*, 914 S.W.2d at 796. The trial court first dismissed the taxpayers' Hancock claims, and this Court reversed that decision and remanded for a decision on the merits of those claims. *Beatty v. Metropolitan St. Louis Sewer District*, 700 S.W.2d 831, 838 (Mo. banc 1985) (*Beatty I* ).

On remand, the trial court concluded that MSD could increase its sewer charges without voter approval. *Beatty II*, 867 S.W.2d at 221. This Court again reversed and remanded. *Id.* Not only did this Court hold that prior voter approval should have been obtained, the Court remanded the case with instructions for the trial court to address plaintiffs' "right to restitution of money *lost by reason of the erroneous or void judgment.*" *Beatty III*, 914 S.W.2d at 796 (emphasis added, quotation marks omitted). There was no claim in *Beatty II*—and no discussion—that the Hancock Amendment authorized or required the refund of all taxes collected in violation of section 22(a). Rather, the Court's remand instructions invoked only the inherent power of courts to order restitution of those taxes collected "by reason of" the trial court's erroneous judgment.

When *Beatty* reached this Court for a third time, the Court acknowledged the conflict it had created by invoking the inherent equitable authority to remedy damages resulting from an erroneous judgment without identifying (or even discussing) whether there was a clear and unequivocal waiver of the state's sovereign immunity that would allow such a money judgment. *Beatty III*, 914 S.W.2d at 796.

ers who relied on section 139.031 are not parties to this case and will not be bound by this Court's decision. Similarly, because Ratepayers did not—by definition—rely on section 139.031, anything this Court might say about the effectiveness of doing so could not affect Ratepayers. Accordingly, the issue is entirely speculative and the Court cannot properly address it. It is sufficient for this case to hold that the Hancock Amendment, by itself, does not authorize this Court to compel MSD to pay Ratepayers an amount equal to the charges it imposed without prior voter approval in violation of section 22(a).

Ultimately, the Court held that it did not need to resolve that issue in *Beatty III* because MSD's own ordinance provided the plaintiffs a sufficient remedy. *Id.* (holding that the Court "need not balance the court's inherent power to impose such a remedy against the state's right to be immune from suit ... [or] determine whether the Hancock amendment transcends the defense of sovereign immunity"). Accordingly, the Court's holding in the present case does not conflict with the holding of *Beatty III* because *Beatty III* expressly declines to reach the question decided here.

Ratepayers' reliance on *Ring*, the fourth chapter of the *Beatty* saga, also is misplaced. *Ring* did not address the question that the Court expressly left open in *Beatty III*. Because *Beatty III* holds that only the named plaintiffs were entitled to the set-off remedy under MSD's ordinance, *Ring* was filed as a class action in the wake of *Beatty III* in an effort to extend that remedy to all of MSD's sewer customers. Ratepayers now rely on the following statement lifted from *Ring's* conclusion: "[W]e hold generally that article X, section 23, operates as a waiver of sovereign immunity and permits taxpayers to seek a refund of increased taxes previously collected by a political subdivision in violation of article X, section 22(a)." *Ring*, 969 S.W.2d at 719. The sweeping language of this statement notwithstanding, there is less to *Ring* than meets the eye.

Though characterized simply as a continuation of the *Beatty* litigation, *Ring's* posture was considerably different. First, *Ring* was not a suit to "enforce" the Hancock Amendment because MSD stopped collecting the increased sewer tax after *Beatty II,* five years earlier. Second, the only authority ever asserted for requiring even partial refunds in *Beatty* was the inherent power of courts to remedy dam-

ages resulting from an erroneous judgment, which was never in issue in *Ring.* Finally, *Ring* addressed an argument that never was raised in *Beatty,* i.e., whether plaintiffs needed to comply with section 139.031 and holds—as the Court does here—that a taxpayer's compliance with section 139.031 has no impact on whether the Hancock Amendment, by itself, waives sovereign immunity and authorizes money judgments. *Ring*, 969 S.W.2d at 719.

*Ring* begins its analysis of whether the Hancock Amendment waives sovereign immunity and authorizes monetary remedies for past violations of section 22(a) by acknowledging the holding of *Fort Zumwalt* that section 23 contains no express waiver of sovereign immunity for purposes of awarding monetary damages as well as the warning in *Fort Zumwalt* that courts must not infer such a waiver unless a money judgment is "essential to enforce the right in question." *Ring*, 969 S.W.2d at 718 (quoting *Fort Zumwalt,* 896 S.W.2d at 923). Against this backdrop, *Ring* notes that taxpayer actions to enforce section 22(a) arise only in two ways. The first is when taxpayers "seek an injunction to enjoin the collection of a tax until its constitutionality is finally determined." *Id.* The second is when:

> ... a political subdivision increases a tax in violation of article X, section 22(a), and collects that tax prior to a final, appellate, judicial opinion approving the collection of the increase without voter approval, **the constitutional right** established in article X, section 22(a), **may be enforced only** by a timely action to seek a refund of the amount of the unconstitutionally-imposed increase.

*Ring,* 969 S.W.2d at 718–19 (emphasis added).

These two scenarios are not simply a menu from which Ratepayers are allowed to select the procedure they prefer. In-

stead, *Ring's* second scenario arises only when the first scenario *is not available,* i.e., when refunds are the *"only"* means of enforcing section 22(a). Here, the first scenario was available. Ratepayers had every opportunity to seek a restraining order or preliminary injunction to enjoin MSD's collection of the stormwater user charge until its constitutional validity was finally determined. Ratepayers elected not to do so. Because refunds were not the "only" means of enforcing section 22(a) in this case, *Ring's* second scenario does not apply.

Finally, Ratepayers contend that the holding in this case is contrary to *Hazelwood.* There, the Court stated: "The people of Missouri have reserved to themselves the constitutional right to enforce the Hancock Amendment, which operates as a wholly independent mechanism for the refund of unconstitutional taxes." *Hazelwood,* 48 S.W.3d at 41. As with the quotation from *Ring,* however, Ratepayers strip the *Hazelwood* statement of its context and create the impression that the Court was answering a question it had not been asked.

Ratepayers' reliance on *Hazelwood* is just as misplaced as their reliance on *Ring.* Neither case was an action to enforce section 22(a). *Hazelwood* addresses the proper construction and application of Missouri's election contest statutes, not the Hancock Amendment. The taxing district never argued that its tax increase was immune from section 22(a); in fact, it conceded that prior voter approval was required. *Hazelwood,* 48 S.W.3d at 38. In-

stead, the taxing district claimed that section 115.595.2, RSMo 2000, authorized it to collect the increased taxes between the election in August 1996 (at which it appeared voters had approved the increase) and the date of the judgment in the election contest seven months later (in which those election results were held to be invalid). *Hazelwood* holds that the introductory language of section 115.595.2 only allows the taxing district to rely on the initial returns at its own risk and subject to an obligation to restore the *status quo ante* if the election contest succeeds. *Hazelwood,* 48 S.W.3d at 40.

Anticipating this result, the taxing district challenged the trial court's class certification and argued that it should only be required to return those taxes that were paid by the named plaintiffs. This Court disagreed. *Id.* But the holding in *Hazelwood* concerning class certification is less important here than the fact that class certification was the context in which the Court made the statement on which Ratepayers rely so heavily. *Hazelwood* was not addressing whether the Hancock Amendment authorizes courts to order refunds or otherwise award money damages as a remedy for violations of section 22(a) because that question was never asked.

■ Read carefully, nothing in *Beatty III, Ring,* or *Hazelwood* holds that article X, section 23, by itself, authorizes courts to award money damages in the form of refunds (or otherwise) as a remedy for a political subdivision levying a tax without the prior voter approval required by section 22(a).[17] For the reasons stated above,

17. As demonstrated above, the extraordinary circumstances and limited scope of this Court's decisions in *Beatty III, Ring,* and *Hazelwood* render the isolated statements that Ratepayers have excised from those decisions inapplicable to the issue now before this Court. More importantly, these decisions pre-date *Taylor,* 247 S.W.3d at 548, in which this Court affirmed *Fort Zumwalt* and held that section 23 authorizes only interpretive or declaratory remedies and such remedies are adequate to enforce the provisions of the Hancock Amendment. In light of the breadth of some of the language used in *Beatty III, Ring,* or *Hazelwood,* however, and recognizing the role that this language may have

the Court holds unequivocally that it does not.

### V. Attorneys' Fees

As noted above, the only money judgment expressly authorized by article X, section 23, is an award of "costs, including attorneys' fees incurred in maintaining the suit" if the taxpayer's claim is sustained. Here, the trial court ordered MSD to pay Ratepayers approximately $4.3 million for their attorneys' fees and an additional $470,000 in expenses. The trial court did not abuse its discretion in making these awards, and, accordingly, they are affirmed.

MSD contends that the trial court erred in including the time counsel spent pursuing Ratepayers' request for refunds when calculating Ratepayers' fee award. MSD argues that Ratepayers are not entitled to be compensated for that time because Ratepayers' claim for refunds did not succeed. Section 23 provides that a taxpayer is entitled to an award of attorneys' fees only "if the suit is sustained." Here, Ratepayers' suit was that MSD violated section 22(a) by levying and collecting the storm water user charge without prior voter approval. MSD confuses Ratepayers' suit with the remedies they sought based on that suit. Even though Ratepayers did not receive every remedy they sought, Ratepayers' suit was sustained in its entirety. Accordingly, the Court affirms the trial court's decision not to attempt to exclude the hours Ratepayers' counsel spent pursuing a refund remedy from the total hours on which Ratepayers' attorneys' fee award is calculated.

MSD also claims that the trial court erred by including in the award of Ratepayers' "costs" the amounts spent on expert fees and other out-of-pocket expenses not traditionally included in the definition of "costs" (e.g., service and transcription fees). This ground has been well-ploughed. *See Roberts v. McNary*, 636 S.W.2d 332, 338 (Mo. banc 1982) ("the language in section 23 referring to costs makes clear that a successful taxpayer-plaintiff shall be reimbursed for all out-of-pocket expenses in pursuing the litigation"), overruled on different grounds by *Keller*, 820 S.W.2d at 304–05. MSD offers no compelling reason to overrule *Roberts* in this regard, and the Court declines its invitation to do so. Because MSD does not argue that the Ratepayers' out-of-pocket expenses were excessive or unreasonable, no further analysis is required, and this claim is denied.

Finally, MSD contends that the trial court erred in applying a multiplier to the lodestar that the trial court calculated in awarding Ratepayers' attorneys' fees. MSD argues that the use of such a multiplier should be error *per se*. In the alternative, MSD urges this Court to adopt the multi-factored federal law analysis first announced in *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 130 S.Ct. 1662, 176 L.Ed.2d 494 (2010), and vacate the trial court's award on that basis. When MSD filed its briefs in this Court, it did not have the benefit of this Court's decision in *Berry v. Volkswagen Group of America, Inc.*, 397 S.W.3d 425 (Mo. banc 2013), which rejects these same arguments. In particular, *Berry* expressly "decline[d] to adopt the use of those federal guidelines to modi-

played in fostering unnecessary litigation regarding the scope of available remedies under section 23, these decisions now are overruled to the extent they suggest that section 23, by itself, authorizes courts to award refunds or other money damages. As noted above, the

Court does not here address the question of whether a taxpayer may be entitled to such remedies by complying with an express waiver of sovereign immunity that may be found in some other statute, ordinance, or provision of applicable law.

fy long standing Missouri law." *Id.* at 432. Instead, *Berry* analyzed—and affirmed—the trial court's use of a multiplier under Missouri's time-tested abuse of discretion standard. *Id.*

In holding that the trial court's use of a multiplier was not an abuse of discretion in *Berry*, this Court noted that the trial court justified its decision on grounds that were not also considered in determining what hourly rate should be used to calculate the lodestar. *Berry*, 397 S.W.3d at 432–33. Here, the same reasoning applies. The hourly rate selected by the trial court to calculate the lodestar did not reflect: (1) the risk Ratepayers' counsel assumed in taking this case on a contingent fee basis; (2) counsel's "opportunity cost" in undertaking this representation, i.e., the value of other matters that counsel could not undertake because of representing Ratepayers; and (3) the impact of Ratepayers' representation on counsel's other cases.

The trial court noted specifically that representing Ratepayers impacted the amount of other work Ratepayers' counsel could undertake and timely provide. More important, however, was the fact that counsel accepted this representation solely on a contingent fee basis. Ratepayers' counsel thereby assumed the risk of receiving no compensation for the time invested or reimbursement for expenses advanced if Ratepayers' claim did not succeed. This risk was substantial, not only because of the difficulty in prevailing on such a claim, but also because the necessary investment of time and resources likely would be substantial given MSD's tenacious defense of similar Hancock challenges in the past. Though their assess-

ment is not binding on the question of a reasonable fee, the trial court noted that Ratepayers and their counsel valued this representation—including the associated risks—at 25 percent of the total amount of stormwater user charges refunded. On that basis, Ratepayers' counsel could have asserted a claim for $22.5 million (i.e., 25 percent of the estimated $90 million in refunds) had such relief been authorized for a violation of the Hancock Amendment.

■ Finally, because the trial court held (correctly) that refunds were not authorized, it believed a multiplier was justified in this case to ensure adequate representation for future taxpayers' claims under section 23. The purpose of the Hancock Amendment's mandatory awards of fees and costs under section 23 is to ensure that taxpayers have access to qualified representation. That purpose would be frustrated if, in extraordinary cases such as this one, the trial court could not ensure adequate compensation for the risks such counsel must assume. *Berry*, 397 S.W.3d at 433 (noting that the application of the multiplier furthered both the remedial and deterrent purposes of the underlying cause of action). Even if qualified counsel are willing to represent taxpayers despite the risk of not being paid (or reimbursed for costs advanced) should the taxpayers' claims fail, such willingness likely will recede or vanish completely if their compensation in the event the taxpayers' claim does succeed is limited to the same amount such counsel would have earned taking cases with no risk of non-payment.[18]

The trial court in this case made an adequate record concerning its calculation

---

18. To emphasize this point, imagine that a Hancock Amendment issue arises and both the political subdivision and its taxpayers approach the same attorney for representation. Why would the attorney represent the taxpayers when: (a) if the taxpayers lose, the attor-

ney will not be paid anything and may not even recover litigation costs incurred, and (b) if the taxpayers win, the attorney will not be paid any more than she would have been paid for representing the political subdivision without the risk of non-payment if it loses?

of Ratepayers' attorneys' fees, and its analysis correctly anticipated this Court's ruling in *Berry*. MSD does not challenge the trial court's conclusions regarding the number of hours or the hourly rate to be employed. It challenges only the trial court's decision to apply a multiplier to the resulting lodestar. The considerations discussed above demonstrate that the trial court's use of a multiplier in this case was not abuse of discretion. Accordingly, the trial court's fee award is affirmed.[19]

A further observation is necessary and appropriate concerning the attorneys' fees and costs in this case. Though the Court is not suggesting that these amounts were unreasonable, the Court believes they are regrettable. As noted above, Ratepayers' fees and expenses exceeded $4.7 million and, even though the amount of MSD's fees and expenses are not in the record, it is unlikely that they were any less formidable. Such staggering sums simply are not acceptable when taxpayers are paying both sides of the bill. *Keller*'s criteria were intended only to help courts understand and apply the *Leggett* test to distinguish fees and taxes under section 22(a). They were not intended—and the Court could not have expected them—to result in the kind of litigation that ensued here.

The trial court, the court of appeals, and this Court have evaluated diligently all of the expert testimony that both parties spent so much time and money submitting. Without debating the admissibility of this evidence, which neither party contests, it should be obvious to anyone reading this opinion (and those of the lower courts) how little impact this evidence had on the outcome of the central legal issue in this case. As noted above, the application of each *Keller* criterion is not a question of fact to be found by the trial court and deferred to on appeal. There is little (if any) need, therefore, for parties to have in-house or retained experts testify as to how they believe the *Keller* criteria should be applied. At the end of the day, the trial court must apply those criteria for itself, and the appellate court will review that application *de novo*.

Despite nearly four days of trial in this case, both parties agree (and a review of the record confirms) that there were few disputed questions of material fact. To be clear, application of *Keller*'s criteria requires certain basic facts. In this case, however, those facts were largely—if not entirely—beyond dispute. As a result, most of the "evidence" at trial consisted of this debate between experts over how the *Keller* criteria should be applied. Legal arguments do not become more persuasive simply because they come from the witness stand rather than the counsel table.

This Court has gone to some lengths to de-mythologize the *Keller* criteria; first in *Keller*, then in *Arbor*, and now in this case. It is hoped that this will clarify whatever confusion *Keller* may have created over whether it is possible to change the classification of a particular charge as a tax or user fee for purposes of section 22(a) simply by manipulating the way in which that charge is presented. It is not. That classification results from the nature of the political subdivision's action in imposing the charge and the relationship between that charge, the services rendered, and the

---

19. Ratepayers filed a motion in this Court for an award of attorneys' fees and costs relating to this appeal. Though "appellate courts have the authority to allow and fix the amount of attorney's fees on appeal, we exercise this power with caution, believing in most cases that the trial court is better equipped to hear evidence and argument on this issue and determine the reasonableness of the fee requested." *Berry*, 397 S.W.3d at 433 (quotation marks omitted). Accordingly, the Court remands this case for the limited purpose of having the trial court hear and determine Ratepayers' motion for appellate fees and costs.

**252**

users of those services. The *Keller* criteria were intended only as a guide for applying section 22(a), not as a roadmap for circumventing it.

In the end, the interests of the taxpayers and their local governmental entities are best served by seeing that cases involving rights created by the Hancock Amendment are resolved quickly, accurately, and without undue expense or delay. With the cloud of potential refunds no longer lowering over such cases, class certifications may become less common. Even when such procedures are invoked, they no longer should have the chilling effect on the practical availability of restraining orders or preliminary injunctions that they may have had in the past. When the facts concerning a claim under section 22(a) are not in dispute, the Court anticipates that such claims will be resolved without trial or on stipulated facts and, if material facts are disputed, the trial should be limited to the disputed issues. Finally, arguments as to the proper application of the *Keller* criteria (and any other relevant considerations) should be made by counsel based on the facts agreed to by the parties or found by the court, just as in any other case.

### CONCLUSION

For the reasons set forth above, this Court affirms the judgment of the trial court in all respects and remands this case for the limited purpose of having the trial court hear and determine Ratepayers' motion for appellate fees and costs.

RUSSELL, C.J., BRECKENRIDGE, FISCHER and TEITELMAN, JJ., concur; STITH, J., concurs in result.

DRAPER, J., not participating.